## GOVERNMENT OF THE VIRGIN ISLANDS
### v.
## HENRY D. KNIGHT, Appellant

[989 F.2d 619]

Nos. 92-7013, 92-7052

United States Court of Appeals
for the Third Circuit

March 15, 1993

251

AMELIA B. JOSEPH (Argued), Christiansted, St. Croix, V.I., and DES-SETA C. MARSIE-HAZEN (Argued), Charlotte Amalie, St. Thomas, V.I., *for appellant*

TERRY HALPERN, United States Attorney; JAMES M. PETERS (Argued) (Assistant United States Attorney), Christiansted, St. Croix, V.I. *for appellee*

BEFORE: BECKER, COWEN and ROTH, *Circuit Judges*

## OPINION OF THE COURT

Cowen, *Circuit Judge*

After numerous postponements of trial dates largely attributable to the defense, defendant Henry Knight filed a notice of intent to raise an insanity defense several days before his trial was scheduled to commence. Federal Rule of Criminal Procedure 12.2(a) precludes a defendant from presenting an insanity defense if the notice of intent is filed after the pretrial motion deadline, but in this case no pretrial motion deadline was set. We hold that when no pretrial motion deadline exists to delineate when a motion is untimely, Rule 12.2(a) contains an implicit requirement that a notice of intent be filed within a reasonable time. Because Knight's notice of intent was filed unreasonably late without any justifiable cause, the district court properly precluded him from interposing an insanity defense at trial. We also find no merit in Knight's challenges to the exclusion of lay opinion testimony, the omission of lesser included offenses from the jury instructions, and the enhancement of his sentence based on a finding that he is a habitual criminal. We therefore will affirm Knight's convictions and his sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

While Henry Knight repeatedly struck Andreas Miller's head with a pistol, the gun discharged and killed Miller. As a result of this incident, Knight was indicted for (1) second degree murder, (2) possession of a firearm by a felon, and (3) possession of a firearm during a crime of violence. He initially pled not guilty, and a trial date of October 22, 1990 was scheduled with a pretrial motion deadline of October 10, 1990. A week before trial, Knight fired his attorney and retained new counsel. Knight sought and was granted a continuance to allow his new lawyer to prepare for trial. The district court set December 5, 1990 as the new trial date. The day before trial, Knight pled guilty to voluntary manslaughter and possession of a firearm by a felon.

At sentencing, Knight moved to withdraw his guilty plea and, once again, substitute counsel. Finding an insufficient factual basis on the plea hearing record to establish all of the elements of voluntary manslaughter, the court permitted Knight to withdraw his plea and to be represented by new counsel. The government demanded a speedy trial and suggested the first week in August. Vol-

unteering to waive his right to a speedy trial, the defendant asked that the case be postponed while his new attorney campaigned for elective office in New York. The court accommodated this request and rescheduled the trial to commence on October 7, 1991, almost a year later than the original trial date. The magistrate judge did not assign a pretrial motion deadline for this new trial date.

On September 30, 1991, the defendant filed with the court a notice of intent to assert an insanity defense. The defense asserted that at the time Knight assaulted the victim he suffered from an adjustment disorder, which was sufficiently severe to qualify him as insane. To support this theory, Dr. Olaf Hendricks, a psychiatrist, filed a report that concluded Knight temporarily lost the capacity to control his behavior at the time of the offense. The defense served the government with notice of Knight's insanity defense on October 1, 1991, three working days before trial was scheduled to commence. The prosecution, surprised by the newly interposed allegation of insanity, moved to strike the notice as untimely. At the hearing on the government's motion, defense counsel informed the district court that he just had discovered that Knight had seen Dr. Hendricks on three occasions. The first meeting occurred two months after the offense, the second at the end of 1990, and the third on the day the notice of intent was filed. None of these meetings took place in the psychiatrist's office.

A criminal defendant waives his right to assert an insanity defense if he files a notice of intent after the pretrial motion deadline. Fed. R. Crim. P. 12.2(a). An insanity defense may be presented at trial despite a belated notification to the government "for cause shown." Id. Although no pretrial motion deadline had been set for the new trial date, the district court held that Knight's notice of intent was unreasonably late. Defense counsel argued that due to the reluctance of West Indian males to discuss psychiatric counseling, he only recently became aware of Knight's meetings with Dr. Hendricks. Because Knight appeared and acted normal, he reasoned, the defense previously had no reason to suspect Knight suffered from a mental defect. The district court found that Knight proffered neither an adequate explanation for the late filing nor sufficient evidence demonstrating the merits of an insanity defense. It therefore precluded Knight from presenting an insanity defense at trial.

The trial commenced as scheduled. During the four-day jury trial, the following facts emerged. On May 31, 1990, Rena

Brodhurst and her brother entered Brodhurst's hurricane-damaged house. Once inside, Brodhurst encountered an individual in the process of stealing personal property. She recognized the intruder as Andreas Miller. Brodhurst, who was eight months pregnant and afraid Miller would hurt her, ran out of her home with her brother. Brodhurst was shaking and crying, but not physically harmed. She immediately located her husband, Henry Knight, and related the event to him.

Knight and his brother immediately searched for Miller and located him at the home of Miller's grandmother. Knight demanded that Miller return the stolen property, but Miller denied any involvement in the burglary. Knight threatened future violence against Miller, and witnesses testified that Knight knocked over Miller's grandmother.

On August 8, 1990, more than two months after the burglary, Knight visited his mother-in-law's residence. By happenstance, he noticed Miller across the street at an auto body shop. Knight decided to confront Miller and demand the return of the property that Miller allegedly stole. Believing that Miller often carried a weapon, Knight armed himself with a .357 magnum pistol and walked directly toward Miller. Knight, a convicted felon, did not have a license to possess a firearm.

Knight demanded the return of his property, but Miller only laughed and cursed at him. Knight admitted that he then grabbed Miller by the collar and struck him on the head with the gun several times. At one point Knight switched the gun into his left hand, picked up a broomstick with his right hand, and beat Miller with the stick until it broke. Witnesses testified that Knight then returned the pistol to his right hand and continued pistol-whipping Miller while Miller retreated and attempted to cover his head. As Knight delivered the final blow to Miller's head, a single shot discharged and entered Miller's neck, causing his death. The pathologist who conducted the autopsy on the victim's body found nine distinct wounds, in addition to the gunshot wound.

Knight disputed that the gun ever returned to his right hand. He testified that Miller grabbed his left hand, which held the pistol, and squeezed it, causing the gun accidentally to discharge. The defense supported this version of the facts with evidence that Knight's left hand was scratched. Defense counsel also elicited eyewitness testimony that Knight never pointed the gun at Miller and

never threatened to shoot him. The district court permitted this factual testimony, but precluded the eyewitness, as well as the investigating police officer, from offering their opinions that the firing of the gun was an accident.

After the prosecution and the defense rested, the district court instructed the jury on second degree murder, voluntary manslaughter, and two types of felony possession of a firearm. The district court declined to give jury instructions on the lesser included offenses of involuntary manslaughter and excusable homicide. Although Knight initially requested an involuntary manslaughter charge, he later rescinded his request because the district court indicated that it would couple the jury instruction that involuntary manslaughter is defined as killing while committing an unlawful act not amounting to a felony, with an instruction that assault with a deadly weapon is a felony. The district court refused to include an excusable homicide charge because it found that a rational jury could not conclude that the killing was excusable.

The jury found Knight guilty of voluntary manslaughter, possession of a firearm during the commission of a crime of violence, and possession of a firearm by a felon. The government sought an enhanced sentence, pursuant to V.I. Code Ann. tit. 14, § 61 (Supp. 1990), as amended by 1991 V.I. Sess. Laws 5759, because Knight was a habitual criminal. The statute defines a habitual criminal as one convicted of a felony within ten years after completing a sentence for a prior felony conviction. V.I. Code Ann. tit. 14, § 61. After being convicted of prior felonies, Knight had been released from prison over ten years before his current conviction, but had completed his parole term only eight years earlier. The defense argued that ten years had elapsed since Knight finished his sentence on the theory that a sentence includes only periods of incarceration. Finding that the statutory term "sentence" embraces parole in addition to jail time, the district court found Knight to be a habitual criminal and sentenced him to ten years imprisonment on all counts.

Knight appeals his conviction as well as his sentence.

## II. INSANITY DEFENSE

■■ Although a criminal defendant initially is presumed sane, see Government of the Virgin Islands v. Webbe, 821 F.2d 187, 189 (3d Cir. 1987), he has the right to raise the defense of insanity, see Lynch v. Overholser, 369 U.S. 705, 713-14, 82 S. Ct. 1063, 1069

(1962). Once the defendant's sanity is challenged, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was sane at the time of the offense. See Webbe, 821 F.2d at 189. A defendant may forfeit the right to assert an insanity defense, however, by allowing the pretrial motion deadline to pass without informing the government and the court of his intention to present the defense. Fed. R. Crim. P. 12.2(a). Rule 12.2(a) provides in relevant part:

> If a defendant intends to rely upon the defense of insanity at the time of the alleged offense, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

A defendant who fails to comply with this provision may not raise insanity as a defense at trial without demonstrating "cause" for the belated filing. Id.

In this case, the magistrate overlooked setting a deadline for pretrial motions, and Knight served the government with a notice of intent to assert an insanity defense three working days before trial. Because of the absence of a pretrial motion cutoff date, the district court substituted a reasonableness test to determine whether Knight's notice of intent was timely. Finding that Knight's filing was unreasonably late, the district court prohibited Knight from presenting an insanity defense to the jury. Knight asserts that the district court erred by reading a reasonable time limit into Rule 12.2(a). Absent a pretrial motion deadline, Knight argues that a defendant may file a notice of intent up until the actual commencement of the trial (or even midtrial). The government defends the approach of the district court as necessary to achieve the rule's objective—to provide the government time to counter an insanity defense without delaying trial. We exercise plenary review over this question of statutory construction. See Electronic Lab. Supply Co. v. Cullen, 977 F.2d 798, 801 (3d Cir. 1992).

■ Although we generally interpret statutory language in accordance with its plain meaning, the Supreme Court has cautioned that the Federal Rules of Criminal Procedure "are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances." Fallen v. United States, 378 U.S. 139,

142, 84 S. Ct. 1689, 1691 (1964). In Fallen, a pro se prisoner mailed a notice of appeal eight days after sentencing. Due to the infrequent prison mail pickup schedule, the notice did not reach the courthouse until five days later. The defendant thus failed to comply with the literal terms of the then effective Federal Rules of Criminal Procedure, which required a notice of appeal to be filed within ten days of sentencing. The Supreme Court nevertheless allowed the prisoner to proceed on the merits of the appeal because "petitioner had done all that could reasonably be expected to get the letter to its destination within the required 10 days." Fallen, 378 U.S. at 144, 84 S. Ct. at 1692. The purpose of the notice requirement—compelling litigants to take all precautions to ensure that appeal notices promptly reach the courthouse—was not subverted by bending the rule and softening the harsh result dictated by its literal application.

■■ No rule should be read literally if such a reading is contrary to its objective. 2A N. Singer, Sutherland Statutory Construction § 46.07, at 126 (5th ed. 1992). Although literal interpretation is favored, "[t]he intention prevails over the letter." Id. Indeed, this court has noted that "the surest way to misinterpret a statute or a rule is to follow its literal language without reference to its purpose." Coco Bros., Inc. v. Pierce, 741 F.2d 675, 679 (3d Cir. 1984) (quoting Viacom Int'l Inc. v. Federal Communications Comm'n, 672 F.2d 1034, 1040 (2d Cir. 1982)); see also Acosta v. Honda Motor Co., 717 F.2d 828, 831 (3d Cir. 1983) (an understanding of the purpose behind the specificity requirements of Fed. R. Civ. P. 50 shows the impropriety of a literal construction). As Justice Roger Traynor stated, we need "literate, not literal, judges." R. Traynor, *Reasoning in a Circle of Law*, 56 Va. L. Rev. 739, 749 (1970).

To implement a rule's purpose, courts of appeals have not hesitated to graft implicit reasonable time limits onto Federal Rules of Criminal Procedure. For example, Federal Rule of Criminal Procedure 14 permits severance of trials when a defendant will be prejudiced by joinder. Although this rule contains no express deadline, a motion for severance may be time barred because a "defendant seeking severance . . . must act in a timely fashion." United States v. Andrus, 775 F.2d 825, 847 (7th Cir. 1985); see also United States v. Beale, 921 F.2d 1412, 1428 (11th Cir.) (courts may consider, among other factors, the timeliness of a motion for severance), cert. denied,— U.S. —, 112 S. Ct. 100 (1991). Courts also have read reason-

able time limits into Federal Rules of Civil Procedure. See, e.g., Smith v. Bowen, 815 F.2d 1152, 1156 (7th Cir. 1987) (Fed. R. Civ. P. 54, governing motions to amend judgments to include attorneys' fees, "imposes no time limit apart from an implicit requirement of reasonableness") (quoting Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d 1226, 1248 (7th Cir. 1981), aff'd on other grounds, 465 U.S. 752, 104 S. Ct. 1464 (1984)); Brittain v. Stroh Brewery Co., 136 F.R.D. 408, 413 (M.D.N.C. 1991) ("Even though the express language of Rule 26(c) does not set out time limits within which a motion for a protective order must be made, there is an implicit requirement that the motion must be timely . . . .").

Knight interprets Rule 12.2(a) in a slavishly literal fashion. If read literally, Rule 12.2(a) states that a defendant forfeits the right to assert an insanity defense only when a pretrial motion date passes without the filing of a notice of intent. Following this analysis to its logical end, if no pretrial motion date is set, no notice of intent, whenever filed, is untimely. Adopting this construction would subvert, rather then implement, the purpose of Rule 12.2(a).

▮▮▮ The Advisory Committee Notes to Rule 12.2 make it clear that the objective of the notice requirement is "to give the government time to prepare to meet the [insanity] issue, which will usually require reliance upon expert testimony." See also United States v. Veatch, 647 F.2d 995, 1003 (9th Cir. 1981) ("[T]he purpose of [Rule 12.2(a)] is substantive, not formalistic. It is to give the Government time to prepare to meet a defendant's insanity defense.") (quoting United States v. Winn, 577 F.2d 86, 89 (9th Cir. 1978)). When evidence of insanity is introduced, the prosecution bears the burden of proving sanity beyond a reasonable doubt. Webbe, 821 F.2d at 189. "In view of the significance of this burden, justice requires prior notice to the Government of an insanity defense." Winn, 577 F.2d at 89. Last minute insanity defenses also "commonly result[] in the necessity for a continuance in the middle of a trial, thus unnecessarily delaying the administration of justice." Fed. R. Crim. P. 12.2 advisory committee's note. Timeliness is thus imperative to conserve judicial resources and to promote the public interest in the speedy disposition of justice.

▮▮▮ Because Rule 12.2 aims to provide the prosecution with sufficient advance notice of a defendant's intent to raise an insanity defense to avoid postponing criminal trials, we hold that notice

must be given within a reasonable time. Therefore, when no pre-trial motion deadline is set, a defendant still may waive his right to present an insanity defense by filing an unreasonably late notice of intent.[1] While we decline to select a number of days before trial beyond which a notice is unreasonably tardy, providing notice three working days before trial, as Knight did in this case, is unreasonable. Knight's failure to comply with the notice requirement of Rule 12.2(a) waived his right to assert an insanity defense.

██ ██ Despite the waiver, Knight nevertheless may interpose his insanity defense at trial if he establishes sufficient "cause" for his failure to satisfy the notice requirement. Fed. R. Crim. P. 12.2(a). To establish cause, a criminal defendant must provide both an explanation for the late assertion of insanity and some evidence that this defense may prevail. United States v. Duggan, 743 F.2d 59, 80 (2d Cir. 1984). The district court found that the defendant had not established either prong of the cause requirement. We review the district court's finding for abuse of discretion. See United States v. Weaver, 882 F.2d 1128, 1136 (7th Cir.), cert. denied, 493 U.S. 968, 110 S. Ct. 415 (1989); Duggan, 743 F.2d at 80.

We first address whether Knight provided an adequate explanation for the belatedness of his notice. Defense counsel asserts, as the reason for the last-minute filing, his discovery only days before trial that Knight had conferred with a psychiatrist. Knight failed to disclose these meetings earlier, the defense suggests, because West Indian males are hesitant to acknowledge that they sought psychiatric counseling. The psychiatrist, Dr. Hendricks, believed that Knight had an adjustment disorder, which prevented him from controlling his behavior at the time of the assault. Since Knight appeared normal, defense counsel argues that he had no reason to suspect that he suffered from a mental defect.

██ The district court did not abuse its discretion by finding that this explanation failed to establish cause for the late filing. The dilatory character of the pursuit of the defense is a factor to consider when analyzing whether cause exists, see Duggan, 743 F.2d at 81–82, and a factor we find compelling in the present case. The

---

[1] Our holding is not intended to condone the failure to assign a pretrial motion deadline. The objective standard set forth in Rule 12.2(a) is preferable to the subjective reasonableness standard that we apply in this case.

many attorneys who had represented Knight had a collective history of employing tactics to delay trial while Knight was free on bail. Approximately one week before his first trial date, Knight discharged his attorney and successfully sought a continuance to allow new counsel time to prepare for trial. Knight then pled guilty to voluntary manslaughter and possession of a firearm by a felon on December 4, 1990, the day before his continued trial date. At the sentencing hearing, Knight sought to withdraw his guilty plea and, once again, retain new counsel to represent him. After receiving court permission to withdraw his guilty plea[2] and to retain new counsel, Knight requested that the case be postponed while his new attorney campaigned for elective office. The court accommodated this request and trial was scheduled for October 7, 1991. Three working days before trial, Knight filed a notice of intent to assert an insanity defense, claiming that he suffered from an adjustment disorder which caused him temporarily to lose the capacity to control his behavior. The district court reasonably concluded that delays overwhelmingly attributable to the defense already had postponed trial for almost a year.

Moreover, Knight's final trial attorney had represented him for nine months by the time the trial commenced. Knight's attorney should have investigated the case and questioned him to ascertain if any factual basis for an insanity defense existed. If he had, he

---

[2] Knight suggests that his guilty plea was solely the result of government misconduct. The record does not support such a finding. At the Rule 11 hearing, Knight maintained that the shooting had been an accident. See Government of the Virgin Islands v. Knight, 764 F. Supp. 1042, 1045 (D.V.I. 1991). In view of this assertion, the district court "expressed doubt that the facts as offered by defendant were sufficient to establish the elements of voluntary manslaughter." Id. Apparently in an attempt to save the plea, Knight's attorney argued that his client's version of the facts supported a voluntary manslaughter conviction because under involuntary manslaughter the acts causing death cannot themselves be a felony. If the death occurs during the commission of a felony, Knight's attorney continued, the offense "'shifts immediately to voluntary manslaughter.'" Id. Knight's attorney concluded that since Knight admitted possessing an unlicensed firearm and possibly the factual predicates for assault with a deadly weapon, both of which are felonies, he had admitted sufficient facts to establish the elements of voluntary manslaughter. Id. Therefore, both parties must accept partial responsibility for Knight's improper plea. Although the Rule 11 hearing record lacked adequate support for a voluntary manslaughter guilty plea, only the record, not the government's evidence, was deficient. Indeed, the jury eventually found Knight guilty of voluntary manslaughter.

would have discovered earlier that Knight had seen a psychiatrist. If he did make this inquiry and Knight denied having seen a psychiatrist or instructed his attorney not to pursue an insanity defense, then no cause existed for the tardy assertion of insanity. See United States v. Dill, 693 F.2d 1012, 1015 (10th Cir. 1982) (defendant's previous lack of interest in pursuing insanity defense did not establish cause).

Because we conclude that Knight failed to provide an adequate explanation for his last-minute assertion of sanity, we need not decide whether, consistent with the two-prong analysis in Duggan, evidence existed to support the proffered insanity defense. We note, however, that the Diagnostic and Statistical Manual of Mental Disorders reveals that although adjustment disorders are common, the disturbance does not meet the criteria for any specific disorder. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 330 (3d ed. 1987). Although we cannot say that an adjustment disorder can never be sufficiently severe to qualify a person as legally insane, it is unclear whether Virgin Islands law recognizes this psychiatric disorder as an excuse for criminal conduct.[3]

The continuous dilatory tactics of the defense and the public's interest in the speedy disposition of a trial that had been pending for almost a year amply support the district court's finding that no cause existed to justify Knight's belated filing.

## III. EXCLUSION OF LAY OPINION TESTIMONY

Knight argues that it was reversible error to exclude an eyewitness' and an investigating officer's testimony that the firing of the gun was an accident. We review the district court's exclusion of lay opinion testimony[4] for abuse of discretion. See United States

---

[3] Virgin Islands law defines insane persons as those "who are mentally ill and who committed the acts charged against them in consequence of such mental illness." V.I. Code Ann. tit. 14, § 14(4) (1964).

[4] Lay opinion sometimes has been referred to as a shorthand statement of the facts. See, e.g., Kerry Coal Co. v. United Mine Workers, 637 F.2d 957, 967 (3d Cir.) ("testimony was merely a shorthand report of his observations"), cert. denied, 454 U.S. 823, 102 S. Ct. 109 (1981); 3 J. Weinstein & M. Berger, Weinstein's Evidence § 701[02] at 701-23 (Matthew Bender 1990) ("One commentator calls this type of opinion testimony 'permissible shorthand rendering of

263

v. Leo, 941 F.2d 181, 192–93 (3d Cir. 1991). Although we agree that the district court committed error by excluding the eyewitness' lay opinion, this error did not prejudice the defendant and therefore does not warrant a reversal of his conviction.

 Federal Rule of Evidence 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The requirement that a lay opinion be rationally based on the witness perception requires that the witness have firsthand knowledge of the factual predicates that form the basis for the opinion. Fed. R. Evid. 701(a) advisory committee's note. The district court properly excluded the investigating police officer's opinion because he did not observe the assault. In contrast, the eyewitness obviously had first-hand knowledge of the facts from which his opinion was formed.

 Having met the firsthand knowledge requirement of Rule 701(a), the eyewitness' opinion was admissible if it would help the jury to resolve a disputed fact. The "modern trend favors admissibility of opinion testimony." Leo, 941 F.2d at 193 (quoting Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980)). The relaxation of the standards governing the admissibility of opinion testimony relies on cross-examination to reveal any weaknesses in the witness' conclusions. Fed. R. Evid. 701(b) advisory committee's note. If circumstances can be presented with greater clarity by stating an opinion, then that opinion is helpful to the trier of fact. See United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982). Allowing witnesses to state their opinions instead of describing all of their observations has the further benefit of leaving witnesses free to speak in ordinary language. See Stone v. United States, 385 F.2d 713, 716 (10th Cir. 1967), cert. denied, 391 U.S. 966, 88 S. Ct. 2038 (1968).

the facts.'") (quoting M. McCormick, Opinion Evidence in Iowa, 19 Drake L. Rev. 245, 248 (1970)).

■ In this case, an eyewitness' testimony that Knight fired the gun accidentally would be helpful to the jury. The eyewitness described the circumstances that led to his opinion. It is difficult, however, to articulate all of the factors that lead one to conclude a person did not intend to fire a gun. Therefore, the witness' opinion that the gunshot was accidental would have permitted him to relate the facts with greater clarity, and hence would have aided the jury. Based on an assessment of the witness' credibility, the jury then could attach an appropriate weight to this lay opinion.

■■ Although the district court should not have excluded this opinion, the exclusion of the opinion was harmless error as it did not prejudice Knight. See United States v. McGlory, 968 F.2d 309, 337 & n.19 (3d Cir. 1992), cert. denied, — U.S. —, 113 S. Ct. 415 (1992). To find an error harmless, a court must be able to say that it is highly probable that the error did not contribute to the jury's judgment of conviction. Government of the Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976). The eyewitness was permitted to describe fully the circumstances that led to his opinion—he stated that Knight never pointed the gun at the victim and never threatened to shoot the victim. Further, Knight himself testified that although he intended to assault Miller, the discharge of the gun was accidental, and defense counsel argued this theory to the jury. The jury could infer from these circumstances that the shooting was accidental.

The opinion of an unbiased eye-witness certainly may be viewed by a jury as more credible than the opinion of a criminal defendant. In this case, however, only a modicum of evidence was necessary to prove the accident theory of the defense because the prosecution barely disputed that the shooting was an accident. Indeed, the government all but conceded this point. During the government's closing argument, the prosecutor himself stated, "[The gunshot] may have been an accident. . . . [The beating] resulted in an unintentional, perhaps—probably unintentional and perhaps accidental discharge of that gun." App. at 30. Under these circumstances, the trial court's ruling could not have significantly prejudiced Knight and a reversal of the conviction is not warranted.

## IV. JURY INSTRUCTIONS

Knight next argues that the trial judge's failure to instruct the jury on the lesser included offenses of involuntary manslaughter

and excusable homicide constitutes reversible error. We address these arguments separately.

A. *Involuntary Manslaughter Instruction*

 Before reaching the propriety of the omission of an involuntary manslaughter charge, we first address the threshold dispute over the proper standard of review. The government asserts that Knight did not object to the absence of an involuntary manslaughter charge. If Knight did not properly object, we review the record only to assure that the district court did not commit plain error. See Fed. R. Crim. P. 52(b).

 Federal Rule of Criminal Procedure 30 provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The specificity requirement imposes a strict standard on defense counsel, but it is not a mere formalism. United States v. Castro, 776 F.2d 1118, 1128–29 (3d Cir. 1985), cert. denied, 475 U.S. 1029, 106 S. Ct. 1233 (1986). Without a clearly articulated objection, a trial judge is not apprised sufficiently of the contested issue and the need to cure a potential error to avoid a new trial. Id. at 1129 (citing United States v. Graham, 758 F.2d 879, 883 (3d Cir.), cert. denied, 474 U.S. 901, 106 S. Ct. 226 (1985)).

 We find that Knight did not preserve an objection to the exclusion of an involuntary manslaughter charge. Knight initially requested that an involuntary manslaughter charge be included in the charge to the jury. The trial judge decided to deliver the charge. At the government's suggestion, the judge announced that the charge would be accompanied by an instruction that assault with a deadly weapon is a felony. Because the involuntary manslaughter charge would be coupled with a definition of a felony that included assault with a deadly weapon, defense counsel withdrew his request for an involuntary manslaughter instruction. Based on the request of counsel, the district court did not give the instruction.[5]

---

[5] After the judge decided to charge the jury with involuntary manslaughter and also explain that assault with a deadly weapon is a felony in the Virgin Is-

Prior to the jury retiring, the district court afforded both parties the opportunity to take exception to the jury instructions on the record. Defense counsel did not object to the absence of an involuntary manslaughter charge.

Knight asserts he requested that the district court not give a particular instruction: an involuntary manslaughter instruction in conjunction with the proposed explanation of a felony. Knight's initial objection to the complete omission of the charge, he argues, clearly indicated that he desired an involuntary manslaughter charge without a clarification of what constitutes a felony. The actions of defense counsel failed to satisfy the requirements of Rule 30. Defense counsel requested that the involuntary manslaughter charge not be given at all. He did not make known that he maintained an objection to the failure to give the charge in the form he advocated. Moreover, when the court asked if either party had any objections to the jury instructions in their final form, defense counsel was silent. The defendant did not convey to the trial judge that he maintained an objection to the omission of an involuntary manslaughter charge.

▮▮▮▮▮ Since Knight failed to properly preserve an objection to the omission of an involuntary manslaughter jury instruction, we review the exclusion of the charge under the plain error standard of Fed. R. Crim. P. 52(b). See United States v. Tsai, 954 F.2d 155, 161 (3d Cir.), cert. denied, — U.S. —, 113 S. Ct. 93 (1992). Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The Supreme Court has admonished courts of appeals to characterize a mistake as plain error "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 1046 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 1592 n.14 (1982)). Under the plain error doctrine, we re-

---

lands, the following colloquy occurred:

> MR. MASON: I'm not requesting the charge.
>
> THE COURT: All right. You're not requesting the charge?
>
> MR. MASON: No.
>
> . . . .
>
> THE COURT: All right. Then I will not charge it.

App. at 110–11.

verse only "particularly egregious errors," id. at 15, 105 S. Ct. at 1046 (quoting Frady, 456 U.S. at 163, 102 S. Ct. at 1592), which "seriously affect the fairness, integrity or public reputation of judicial proceedings," id. (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S. Ct. 391, 392 (1936)). To find plain error, the mistake must be sufficiently obvious that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." Frady, 456 U.S. at 163, 102 S. Ct. at 1592; United States v. Thame, 846 F.2d 200, 205 (3d Cir.), cert. denied, 488 U.S. 928, 109 S. Ct. 314 (1988).

 The absence of an involuntary manslaughter instruction was not plain error. A jury instruction must contain a lesser included offense only if the evidence adduced at trial could support a guilty verdict on either charge. See Sansone v. United States, 380 U.S. 343, 349–50, 85 S. Ct. 1004, 1009 (1965); United States v. McGill, 964 F.2d 222, 239 (3d Cir.), cert. denied, — U.S. —, 113 S. Ct. 664 (1992).[6] Involuntary manslaughter, in relevant part, is the unlawful killing of a person during "the commission of an unlawful act, not amounting to a felony." V.I. Code Ann. tit. 14, § 924(2) (1964). Therefore, Knight was entitled to an involuntary manslaughter charge only if a jury rationally could find that he was not committing a felony at the time the gun discharged.

 Assault with a deadly weapon is a felony in the Virgin Islands. V.I. Code Ann. tit. 14, § 297(2) (Supp. 1990). Knight admitted that he intentionally and repeatedly hit the victim's head with a loaded .357 magnum pistol. It was not plain error, if error at all, for the district court to conclude that a rational jury would have to find that using a loaded gun to beat a person's head rises to the level of assault with a deadly weapon and is not merely a simple assault, see V.I. Code Ann. tit. 14, § 291 (1964), or an assault that inflicts disgrace, see V.I. Code Ann. tit. 14, § 298(6) (Supp. 1990). Although a defendant is entitled to have a jury, not a judge, act as fact finder, a trial court "need not instruct the jury on a lesser-included offense unless . . . a jury could rationally find the defendant guilty of the lesser offense and not the greater." Commissiong, 706 F. Supp. at

---

[6] Under Virgin Islands law, involuntary manslaughter is a lesser included offense of second degree murder. See Government of the Virgin Islands v. Commissiong, 706 F. Supp. 1172, 1188 n.4 (D.V.I. 1989) (involuntary manslaughter lesser included offense of first degree murder).

1188; see 3 C. Wright, *Federal Practice and Procedure* § 515, at 21 (1982).

B. *Excusable Homicide Instruction*

■ Knight's second challenge to the jury instructions assigns error to the omission of a jury instruction regarding excusable homicide. A homicide is legally excusable "when committed by accident and misfortune, or in doing any lawful act by lawful means, with usual and ordinary caution, and *without any unlawful intent.*" V.I. Code Ann. tit. 14, § 926(1) (1964) (emphasis added). Knight contends that if the jury believed his testimony, they rationally could find that the killing was excusable.

Even if we assume that a jury believed all of Knight's testimony, there was no evidence that Knight possessed a lawful intent when the gun discharged. Knight admits that he intentionally was assaulting Miller with an illegally owned firearm when the gun discharged. Although Knight may not have had an intent to kill Miller, the intent to assault and inflict serious bodily harm is not a lawful intent.

Knight argues that his intent was lawful because he believed he was in danger.[7] The only evidence supporting this assertion is Knight's statement that he believed the victim often carried a gun. Even if the victim had a gun (which in fact he did not), it is undisputed that Knight initiated the confrontation with Miller. Although Miller never threatened to harm Knight, never assaulted Knight, and never brandished a weapon, Knight beat him over the head with a gun and broomstick. No evidence supports the conclusion that Knight reasonably believed he was in imminent danger of harm when he assaulted Miller. The district court properly declined to include a jury charge on excusable homicide.

## V. SENTENCE ENHANCEMENT FOR HABITUAL CRIMINALS

Having decided to uphold Knight's conviction, we now turn to the challenge to his sentence. Knight argues that the district court improperly enhanced his sentence based on a finding that he was a

---

[7] This argument is strikingly similar to a self-defense theory. Cf. Commissiong, 706 F. Supp. at 1189 (jury rejecting self-defense could not acquit defendant by finding excusable homicide). It is therefore interesting to note that Knight specifically requested that the district judge not instruct the jury regarding self-defense.

269

habitual criminal pursuant to V.I. Code Ann. tit. 14, § 61 (Supp. 1990), as amended by 1991 V.I. Sess. Laws 5759. Section 61 mandates a minimum ten-year prison term for convicted felons who subsequently are convicted of another felony. There is a time limitation, however, on which felonies may be utilized to establish the criminal history necessary to trigger the automatic ten-year sentence. A court may treat a defendant as a habitual criminal only if his subsequent felony conviction is "within ten (10) years after the date the person has completed serving his sentence on the prior felony conviction." V.I. Code Ann. tit. 14, § 61(a).

■ At the time of Knight's current conviction, he had been out of prison for more than ten years, but had completed his parole term less than eight years earlier. Knight asserts that his sentence expired over ten years ago because the statutory term "sentence" encompasses only incarceration and excludes parole time. If Knight is correct, the district court erroneously categorized Knight as a habitual criminal and improperly increased his sentence. However, if a "sentence" includes parole, as the district court found, then ten years has not elapsed since Knight completed his sentence, and the court correctly invoked the ten-year automatic sentence for habitual criminals. Since whether the term "sentence" includes parole is a pure question of statutory construction, our review is plenary. Electronic Lab. Supply Co. v. Cullen, 977 F.2d 798, 801 (3d Cir. 1992).

■■ It is axiomatic that statutory interpretation begins with the language of the statute itself. Pennsylvania Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 557–58, 110 S. Ct. 2126, 2130 (1990). Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive. See Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S. Ct. 2051, 2056 (1980). The plain meaning rule, however, is not absolute. A court may consider persuasive legislative history that Congress did not intend the words they selected to be accorded their common meaning. Watt v. Alaska, 451 U.S. 259, 266, 101 S. Ct. 1673, 1678 (1981) (cited in Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 910 (3d Cir. 1990)). A construction inconsistent with a statute's plain meaning, however, is justifiable only when clear indica-

tions of a contrary legislative intent exist. Consumer Party v. Davis, 778 F.2d 140, 147 (3d Cir. 1985). In other words, if the statutory language is clear, a court must give it effect unless this "will produce a result demonstrably at odds with the intention of [the] drafters." Griffen v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S. Ct. 3245, 3250 (1982).

■ Because we are interpreting a criminal statute, another principle of statutory construction is relevant. The rule of lenity requires that any ambiguity concerning the meaning of a criminal statute be resolved in favor of the criminal defendant. Crandon v. United States, 494 U.S. 152, 168, 110 S. Ct. 997, 1007 (1990). This doctrine applies not only to substantive criminal prohibitions, but also to the penalties they impose. See Bifulco v. United States, 447 U.S. 381, 387, 100 S. Ct. 2247, 2252 (1980); United States v. Long, 654 F.2d 911, 914 (3d Cir. 1981).

■■ Virgin Islands law mandates that the sentencing court impose a minimum of ten years imprisonment if the current felony conviction occurred within ten years after the defendant has completed "serving his sentence" on the prior felony conviction. V.I. Code Ann. tit. 14, § 61. Black's Law Dictionary defines a sentence as:

> The judgment formally pronounced by the court or judge upon the defendant after his conviction in a criminal prosecution, imposing the punishment to be inflicted, usually in the form of a fine, incarceration or probation.

Black's Law Dictionary 1362 (6th ed. 1990). A sentence therefore includes all terms that are part of a criminal's punishment.

Imprisonment is obviously punishment because a criminal's liberty is severely restricted—he cannot leave the prison grounds and cannot see family and friends at will. Parole is also part of a criminal's punishment. When on parole, a criminal's liberty is still restricted, although less significantly than a prisoner's. For example, a parolee may not leave the Virgin Islands without written permission from the Parole Board and may not frequent places selling liquor. See V.I. Code Ann. tit. 5, § 4604 (1967). These restrictions on a parolee's freedom demonstrate that parole is a form of punishment.

Case law supports our common-sense reading of the statutory term "sentence." The Supreme Court has assumed that the word

"sentence", not within the context of any particular statute, includes a parole term. See Maleng v. Cook, 490 U.S. 488, 491, 109 S. Ct. 1923, 1925 (1989) ("[A] prisoner who ha[s] been placed on parole [is] still 'in custody' under his unexpired sentence."); Hewitt v. Helms, 459 U.S. 460, 466 n.12, 103 S. Ct. 864, 879 n.12 (1983) (Stevens, J., dissenting in part) ("criminal offenders [may] serve their sentences on probation or parole") (quoting Greenhultz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 24–25, 99 S. Ct. 2100, 2113 (1979)); Roberts v. United States, 445 U.S. 552, 555, 100 S. Ct. 1358, 1361 (1980) (sentences included prison term and special parole term). Moreover, this court explicitly has held that parole is a component of a sentence. See United States v. Crusco, 536 F.2d 21, 24 (3d Cir. 1976). In Crusco, the district judge told a defendant who pled guilty that the maximum sentence he faced was seven years. The judge than sentenced the defendant to six years imprisonment and the three years special parole required by statute. The defendant sought to withdraw his plea asserting that he believed he would spend no more than four years in prison. He calculated this figure by subtracting the mandatory three year parole period from the maximum sentence of seven years. We found the defendant's belief that his maximum prison term would be four years to be justified in light of the district judge's explanation because "[t]he definition [of a sentence] clearly encompasses a . . . parole term." Id.

Because the plain meaning of the statutory term "sentence" includes parole, Knight bears the burden of demonstrating a clear indication of a contrary legislative intent in order to prevail. See Consumer Party, 778 F.2d at 147. Knight claims that the history of the statute's amendment clearly establishes that the legislature was referring only to imprisonment when it utilized the term "sentence." We disagree.

As originally enacted, V.I. Code Ann. tit. 14, § 61 imposed a ten-year minimum sentence on felons with any previous felony conviction irrespective of the age of the prior conviction. The Virgin Islands legislature passed, and submitted to the governor, an amendment to this statute that placed a ten-year limitation on the use of a prior felony conviction to trigger the automatic minimum sentence. See V.I. Leg. 19-0008, 19th Leg. (1991), App. at 129. The governor vetoed this bill. In his veto letter dated November 13, 1991, the governor wrote that "[w]hile several states have moved

in this direction, they have done so with 'tolling' sections, *meaning time spent in jail* does not count toward the ten-year, felony-free proving period." App. at 127 (emphasis added). Responding to the governor's veto, the legislature redrafted the bill incorporating the current language. On the senate floor, Senator Brown stated that the amendment now "include[s] the provision which the Governor pointed out was important to include." App. at 132. The reworded amendment was passed by the legislature and signed into law by the governor.[8]

The dialogue between the governor and the legislature is hardly compelling evidence of an intent to exclude parole time from the definition of a sentence. The governor's veto letter merely described the approach other states had taken. The governor wanted an analogous provision to be included in the Virgin Islands habitual criminal statute, but he suggested only a vague concept, not a particular statutory scheme. His remarks, limited to a few sentences, contained neither details on how to implement this idea nor proposed language for the reworded amendment. The governor never discusses the effect of parole because there is no indication he considered this issue or any other particulars. Senator Brown's statement that the redrafted amendment addresses the governor's concerns refers to the fact that a tolling provision was added. Nothing in this exchange sheds any light on whether the legislature intended that the term "sentence" encompass parole time. In the absence of compelling evidence of a contrary legislative intent, we accord the term sentence its ordinary meaning—a sentence includes both imprisonment and parole.

## VI. CONCLUSION

For the foregoing reasons, we will affirm the judgment containing Knight's conviction and sentence.

---

[8] The government argues that the amendment, which added the time limitation on the use of prior felonies, is not applicable to Knight because it is not retroactive. The amendment was enacted after Knight committed his crimes and was convicted, but before the date of sentencing. Because we hold that even if the statute applied to Knight, he had not completed his sentence ten years before his current conviction, we need not reach the retroactivity issue.