IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**

January 17, 2024 09:48 AM
SCT-CRIM-2017-0051
VERONICA HANDY, ESQUIRE
CLERK OF THE COURT

**For Publication**

# IN THE SUPREME COURT OF THE VIRGIN ISLANDS

| | |
|---|---|
| **CECIL N. ROUSE,**<br>    Appellant/Defendant,<br><br>v.<br><br>**PEOPLE OF THE VIRGIN ISLANDS,**<br>    Appellee/Plaintiff. | )  **S. Ct. Crim. No. 2017-0051**<br>)  Re: Super Ct. Crim. No. F281/2012 (STT)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

On Appeal from the Superior Court of the Virgin Islands
Division of St. Thomas and St. John
Superior Court Judge: Hon. Adam G. Christian

Argued: July 10, 2018
Filed: January 17, 2024

Cite as: 2024 VI 4

BEFORE: **RHYS S. HODGE**, Chief Justice; **MARIA M. CABRET**, Associate Justice; and **IVE ARLINGTON SWAN**, Associate Justice.

APPEARANCES:

**Robert L. King, Esq.**
The King Law Firm, P.C.
St. Croix, U.S.V.I.
    *Attorney for Appellant,*

**Ian S. A. Clement, Esq.**
Assistant Attorney General
Department of Justice
St. Thomas, U.S.V.I.
    *Attorney for Appellee.*

## OPINION OF THE COURT

**SWAN, Associate Justice.**

¶1    Appellant, Cecil N. Rouse, was convicted on October 6, 2017 following a three-day jury trial on charges that he shot his wife with a semi-automatic handgun in the couple's bedroom, on the morning of a court hearing on the wife's petition for a divorce. Rouse seeks reversal of his

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 2 of 45

2024 VI 4

convictions in the Superior Court of the Virgin Islands ("Superior Court") for "Attempted First Degree Murder," V.I. CODE ANN. tit 14, §§ 921(b), 922(a)(1); "First Degree Assault" as an act of "Domestic Violence" 14 V.I.C. § 295(1), (4); 16 V.I.C. § 91(b); "Unauthorized Possession of a Firearm During a Crime of Violence," 14 V.I.C. §§ 2253(a), (c); "Third Degree Assault" as an act of "Domestic Violence," 14 V.I.C. § 297(2); 16 V.I.C. § 91(b)(1); and "Possession of a Firearm Without a License," 23 V.I.C. §§ 452, 454.

¶2 Rouse advances a plethora of legal issues on appeal. First, he argues that there was insufficient evidence to sustain his convictions as to all counts because the prosecution failed to prove beyond a reasonable doubt that his actions were not a consequence of mental illness. Rouse next argues that the trial court abused its discretion when it allowed the prosecution's expert witness to testify, in its rebuttal case, regarding deficiencies in Rouse's expert's opinion. He then asserts that the cumulative effect of the numerous improper statements and arguments by the prosecutor in opening and closing arguments constituted a violation of Rouse's due process rights warranting a finding that the trial court abused its discretion when it failed to declare a mistrial. Finally, Rouse argues that the trial court abused its discretion when it instructed the jury that Rouse had the burden to present "some evidence" of his insanity, which, he argues, unconstitutionally shifted the burden of proof to Rouse, thus requiring reversal. For the reasons elucidated below, all Rouse's convictions are affirmed.

## I. BACKGROUND

¶3 Prior to the beginning of trial, Rouse challenged the admission of evidence from the People's expert, Dr. Laurie McCormick-McPearce, because, as defense counsel argued, the law mandated that, once a criminal defendant gives notice of an insanity defense prior to trial, the

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 3 of 45

2024 VI 4

burden of both production and proof is upon the prosecution to prove the defendant's sanity beyond a reasonable doubt. (J.A. at 194.) The court did not rule on this objection and allowed Rouse to assert the objection at the appropriate time during the trial. (J.A. at 198.)

¶4    Following preliminary instruction to the jury, counsel made their opening statements. (J.A. at 221.) During opening statements, the prosecution made statements that were arguably improper, for example: "All because of the defendant shooting her on May 10, 2012. Now, as far as the defendant. Since that time, the defendant still had a plan. He went out and retained one of the best, if not the best defense attorneys on island." (J.A. at 224.) Counsel for Rouse objected, and the objection was sustained. (J.A. at 224-25.) Similarly, during opening statements, the prosecution said the following, "And the defendant was referred to Dr. [Leighman] Lu, a psychiatrist. Dr. Lu evaluated the defendant nearly six months after this shooting occurred and he evaluated him twice in December of 2012, and after seeing him two times, Dr. Lu concluded [that] the defendant on May 10, 2012 suffered from something called a Dissociative Reaction. The defendant who has never really stated his side of the case." (J.A. at 225.) Again, defense counsel objected and also moved for a mistrial. (J.A. at 225.) The court denied the motion for mistrial and reminded the jury that the opening statement was not evidence and that the People bore the burden of proving Rouse's guilt beyond a reasonable doubt. (J.A. at 227.) The court further informed the jury that the defendant had no burden of proof and had no responsibility to testify. (J.A. at 227-28.) Following this instruction, the prosecutor stated "Because insanity has been raised the burden shifts to the People to prove beyond a reasonable doubt. . ." (J.A. at 228.) Defense counsel immediately objected to this statement and argued that this statement was the prosecution shifting the burden to the defendant stating, "he's talking about when the government shifts the burden.

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 4 of 45

2024 VI 4

There's never been a burden on the defendant. It's not a matter of shifting the burden." (J.A. at 228-29.) Defense counsel again moved for a mistrial. (J.A. at 229.) Both motions were denied.

¶5      Rouse took the stand in his defense. (J.A. at 549.) Prior to his arrest on the day of the shooting, Rouse had never been in trouble with the law or been arrested. (J.A. at 550.) Rouse had lived in the Virgin Islands for more than 40 years and had served in the Virgin Islands National Guard for 12. (J.A. at 550.) Rouse explained that he had obtained the firearm with which he had shot Vida when it was left at his home after he had hired a business to conduct repairs on his generator. (J.A. at 553.) Upon finding the firearm, Rouse had hidden it in the master bedroom, but he had never loaded ammunition in the firearm and did not know to whom the firearm belonged. (J.A. at 554.) Rouse admitted he never obtained a license to possess the firearm. (J.A. at 554.) During cross-examination, he explained that he kept the firearm because he planned to return it to the owner, but the owner never returned to claim it. (J.A. at 563.) Rouse had possessed the firearm "for a while," so long, in fact, he "actually forget about it." (J.A. at 564.) When further questioned, Rouse estimated he had possessed the firearm for a year. (J.A. at 564.)

¶6      Rouse then testified that he had no memory of shooting his wife or pointing the loaded firearm at his daughter on May 10, 2012. (J.A. at 555.) Similarly, Rouse did not remember firing the weapon into his chest. (J.A. at 555.) He then recounted the events of the morning leading to shooting his wife, Vida. (J.A. at 55.) Rouse testified that Vida woke him that morning pulling the sheets and saying "Get up. Get up. Your old island a*s. Get up out of the bed and come move your car." (J.A. at 555-56.) After he responded to "take it easy," he asserted Vida responded, "You're saying you don't have no money. I don't want your f***ing money anyhow. I got people

to give me money." (J.A. at 556.) Rouse again told Vida to "take it easy." To this, Vida again said, "I don't want your f***ing money anyhow. I got people to give me money." (J.A. at 556.)

¶7     Rouse then questioned why Vida was acting as she was, and Rouse asserted that her response was, "I going to divorce you anyhow. Today is your last day and you ain't going get nothing. When your mothers***t was in Nevis, you ain't had nothing, and I ain't going give you nothing." She went on, according to Rouse, "I going to divorce you today and you ain't going get nothing. When you done, you going walk out of here with nothing." (J.A. at 556.) He then asserted that Vida said, "Furthermore, Shenovia is not your daughter." (J.A. at 557.) He further claimed that Vida declared Shenovia's father to be a man called "Chop Chop." Rouse explained, "when she told me that, I just—everything change. My body change. I start shaking. My head hurting me. I didn't know what to do. When I catch myself, I woke in the hospital. That's all I remember." (J.A. at 557.) Rouse specifically remembered Vida calling him lazy and worthless. (J.A. at 557.) Rouse further asserted that he had no memory of speaking with the police once he awoke in the hospital. (J.A. at 557.)

¶8     Upon cross-examination, Rouse readily admitted his memory of the morning leading up to the shooting was very detailed and maintained that he remembered nothing after Vida had told him Shenovia was not his daughter. (J.A. at 558.) Rouse further denied that he had ever questioned Vida if she was really going through with the divorce. (J.A. at 559.) Rouse further denied that Vida told him she was going to divorce him that morning and denied that, in response, he told her he was going to kill her and then shot her. (J.A. at 559.) Rouse further testified that he felt "bad" when, that morning, Vida had said he was lazy and worthless, but he qualified that Vida "is a

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 6 of 45

2024 VI 4

control person. She always trying to control everything around—everybody around her." (J.A. at 559.) However, Rouse denied that Vida's comments had made him angry. (J.A. at 560.)

¶9    Rouse further maintained that, though the divorce had been in progress for two years, he was not upset by the prospect and "had no feelings on it one way or another." (J.A. at 560.) Indeed, he testified that he wanted the divorce. (J.A. at 560-61.) (J.A. at 561-62.) Rouse admitted that he remembered Vida telling him that Shenovia was not his daughter but denied remembering pointing the loaded firearm at her. (J.A. at 562-63.) During further questioning, Rouse asserted that Vida had claimed she would get the marital home, but Rouse denied being upset, explaining that no one knew who would get the home before going to court. (J.A. at 565.) Rouse admitted that he was ultimately denied any ownership interest in the home and that he was upset about this…."Just a little." (J.A. at 565.) When asked directly if he had shot Vida because she told him on the morning of May 10, 2012, that she intended to go through with the divorce, Rouse responded, "No." (J.A. at 566.) Upon re-direct examination, Rouse asserted that he would not have intentionally shot his wife or pointed the loaded firearm at his daughter. (J.A. at 566.)

¶10    Dr. Leighman Lu, a medical doctor specializing in neuropsychiatry and employed at the Virgin Islands Department of Health, testified next. (J.A. at 568.) Dr. Lu testified to his qualifications and was duly qualified as an expert in psychiatry. (J.A. at 580.) The doctor had taken a medical and psychological history of Rouse, taking into account family history of mental illness, upbringing, education, personal history, general family history, and other relevant factors—this history was obtained solely from Rouse. (J.A. at 582-83.) Rouse had been raised by his paternal grandmother and knew little of his mother's family except that his mother had spent much of her life in and out of the hospital with a mental disorder. (J.A. at 583.) Additionally,

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 7 of 45

2024 VI 4

different psychological evaluations were provided in which Rouse provided answers to written questions. (J.A. at 584.) These evaluations were administered over the course of two meetings on two different days approximately 4 days apart. (J.A. at 585.) Rouse's responses indicated a high "score" with regard to his "manic" and "psychotic" thinking processes. (J.A. at 586.) An average person would generally score a one or two, while a score of five or higher tends to indicate that a person has some form of abnormal thinking process. (J.A. at 586.) Manic thinking refers to a person's thought processes that "race" or change rapidly, and psychotic thinking is thinking that tends to not reflect reality. (J.A. at 587.) Rouse had "subclinical level psychotic processes." (J.A. at 589.)

¶11     Dr. Lu's ultimate conclusion was that Rouse had "a tendency to become mentally ill under the great deal of stress," but that the signs and symptoms were not detectable during "normal" conversation. (J.A. at 589.) Dr. Lu more fully explained as follows:

> [I]t seems to me from what he give me his story and reviewing the police report and reviewing the family member's report and put together at the time of the alleged offense, he was in a state of mental confusion, that confusion because of stress, because of heightened anxiety, because of heightened anxiety. Because of heightened frustration and anger putting that together led into state of mental confusion and during that time, he didn't know what he was doing. Memory is disturbed.

(J.A. at 589-90.) Dr. Lu expounded that Rouse was under "a great deal of stress, I think he's under a great deal of stress because of the wife, spouse pressuring him. That's what he said. She was repeatedly telling him this child, the last child is not his." (J.A. at 590.)

¶12     Rouse had explained that Vida had filed for divorce in 2010, and on the day of the shooting, as Dr. Lu recounted, Rouse explained that Vida

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 8 of 45

2024 VI 4

was pressuring him and cursing. He said cursing. Remembers she was cursing and pressuring him in getting divorce. In fact, two years before that, the first time I saw him was 2012.

Two years before that. So 2010 she did file divorce. After that, he said they frequently ran into argument and that particular day that he was so shocked. He was so upset. He was so angry because she repeatedly said I'm going to divorce you.

I am going to divorce you. He got so angry. In his mind in his irrational thinking that he felt. He said he had no way to talk to her and retract that divorce filed. So, in his way of thinking the only way to solve this problem is kill him or kill her and kill myself and this way we don't have to go to divorce hearing and we are still together in a different world.

(J.A. at 590-91.) Ultimately, Dr. Lu concluded, "the shooting appears to be a consequence of his frustration, anger and his pent up feeling and he slipped into that kind of dissociative state of mind and as a result of that he decided to kill himself and kill her to avoid from the divorce proceedings." (J.A. at 592.)

¶13 The People pursued typical topics of cross-examination. For example, it was elicited that the doctor was paid for his diagnoses and testimony and had not ever seen Rouse until six months after he shot Vida. (J.A. at 593, 599.) Dr. Lu was further asked to explain the basic criteria he used to diagnose Rouse, and he explained that the criteria included (1) a cloudy memory, (2) irrational thinking, (3) memory disturbance, and (4) a background of emotional instability. (J.A. at 594.) Dr. Lu further explained that Rouse had informed him that, since he was 30, Rouse would drink under stress and had been drinking every day from approximately 6:00 p.m. until 9:00 p.m. in the months leading up to the shooting. (J.A. at 595.) The night before the shooting, Rouse had been drinking and when he got home had fought with Vida until the next morning, with the argument only ceasing while Rouse slept. (J.A. at 596.) Therefore, in the morning when he awoke,

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 9 of 45

2024 VI 4

Rouse "was so frustrated and angry and in his mind the only solution is killing himself, kill her." (J.A. at 596.) When asked about Rouse's drinking habits, Dr. Lu believed that, since the shooting, Rouse had stopped drinking due to the restrictions placed on him during pre-trial release. (J.A. at 599.)

¶14     The People called Dr. Laurie McCormick-McPearce as their first witness in their rebuttal case. (J.A. at 623.) Dr. McCormick-McPearce was licensed to practice medicine in the Virgin Islands as a psychiatrist and explained her education and work experience. (J.A. at 624.) Dr. McCormick-McPearce obtained her bachelor's degree in biology and a medical doctorate. (J.A. at 624.) She spent five years studying for her bachelor's degree and three years studying for her M.D., after which she completed a fellowship in psychiatry and family medicine and a fellowship in neuropsychology and neuroimaging and neuroscience with an emphasis on phrenology. (J.A. at 624.) She then worked as a university professor teaching medicine, after which she moved to St. Thomas and began her practice in the Territory. (J.A. at 624-25.) She has published 29 academic articles and three chapters in books regarding her areas of practice. (J.A. at 625.)

¶15     Defense counsel took the opportunity to voir dire Dr. McCormick-McPearce, and during this questioning it was established that Dr. McCormick-McPearce had been qualified as an expert in over 100 cases, 10 to 15 of which were in the Virgin Islands. (J.A. at 630.) Dr. McCormick-McPearce had training in the area of temporary insanity but had not served as an expert in any case in which temporary insanity was an issue. (J.A. at 631.) In follow up, the People questioned Dr. McCormick-McPearce, and she testified that, in her practice, she had dealt with patients with dissociative disorders, particularly people with post-traumatic stress disorder, and had taught

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 10 of 45

2024 VI 4

dissociative disorders as part of her teaching career. (J.A. at 632.) The defense ultimately accepted Dr. McCormick-McPearce as an expert in psychiatry. (J.A. at 633 ("I'll accept her as an expert."))

¶16     Dr. McCormick-McPearce then explained that the People had retained her, with compensation, to offer an opinion in this case regarding Rouse. (J.A. at 633-34.) When asked if these facts in any way clouded her professional judgment, Dr. McCormick-McPearce explained that she was objective and only stated her medical opinion. (J.A. at 634.) At this juncture, defense counsel objected to the admission of Dr. McCormick-McPearce's expert report, stating "Your Honor, she's been recognized as an expert and, of course, she's able to testify as to what she reviewed and what her findings are. Her report, however, is not something that would be admissible under any circumstances." (J.A. at 635.) The trial judge agreed, stating, "She can testify about it, but the actual document. Unless there's some hearsay exception, it falls under or its going to be introduced for a purpose other than the truth of the matter in which case it wouldn't be hearsay. I think Attorney King has a point. Just ask her about her opinions, ok. If she can't recall you could use it to refresh." (J.A. at 636.) Later, during this testimony, the court precluded Dr. McCormick-McPearce from testifying to facts in the police reports, stating "She can't recite from what she read. That's hearsay." (J.A. at 647.)

¶17     Dr. McCormick-McPearce then explained that, having reviewed the report of Dr. Lu as well as the reports of two officers who had responded to the scene of the shooting, but not having ever met Rouse, Dr. Lu's conclusion was not a valid medical diagnosis but was, instead, a description of a person's "personality basis." (J.A. at 642.) Additionally, Dr. McCormick-McPearce explained that Rouse's experiences as described by Dr. Lu were not dissociative experiences, either before or after the shooting. (J.A. at 642.) Typically, a person who has a

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 11 of 45

2024 VI 4

dissociative reaction has a history of childhood trauma relating to severe physical or sexual abuse. (J.A. at 643.) These events in childhood then lead to stressful events triggering a dissociative reaction during adulthood. (J.A. at 643.) Rather, what Rouse described was simply an inability to remember the event. (J.A. at 642.) People who experience dissociative states generally have an ongoing course of dissociative episodes when stress is high. (J.A. at 645.) Ultimately, Dr. McCormick-McPearce concluded that "dissociative disorders themselves are pretty rare, and people that do have them almost always have a history of previous problems and ongoing problems with disassociation." (J.A. at 645.)

¶18 Dr. McCormick-McPearce explained further that Dr. Lu's report made no mention of anything that could be described as a dissociative reaction. (J.A. at 647.) Finally, Dr. Lu's report included examples of cognition by Rouse that were directly contrary to experiencing a dissociative state. (J.A. at 647.) Examples that were provided include Rouse shooting his wife and pointing the gun at his daughter and then deciding not to shoot his daughter—showing that Rouse was not angry at the daughter and chose to point the gun again at Vida. (J.A. at 648.) She explained that, during a dissociative state, the dissociation lasts for an extended period, and the affected person would not be able to distinguish between someone they wanted to shoot and someone they did not want to shoot. (J.A. at 648.) Therefore, the fact that Rouse was able to point the firearm, hesitate, and then decide to point the firearm back at Vida precluded the conclusion that Rouse had entered a dissociative state at the time of the shooting. (J.A. at 648.) Similarly, Rouse's choice to shoot himself was indicative of remorse, which is not an emotion someone in a dissociative state would experience. (J.A. at 648.) Dr. McCormick-McPearce further explained that the 7.5 months between the shooting and Dr. Lu's first ever meeting with Rouse is problematic because memories

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 12 of 45

2024 VI 4

fade and people discuss events and blur what they remember with what they were told. (J.A. at 649.) Ultimately, Dr. McCormick-McPearce concluded that Dr. Lu's diagnosis was neither valid nor reliable. (J.A. at 661.)

¶19 The defense again moved for acquittal "on the very same basis that we stated before except there's one additional basis." (J.A. at 669.) That additional basis was that there was no "evidence from the Government that establishes, that presented evidence from which the jury can find beyond a reasonable doubt that Mr. Rouse was not insane on the date of this event." (J.A. at 669.) In reviewing the jury instructions relating to the insanity defense, Rouse's counsel stated the following:

> [The] definition of what ["]some evidence["] is what is precisely in issue. It's my view and I've expressed it several times that the mere filing of the notice of intent of insanity defense is enough . . . .

(J.A. at 672.)

¶20 Following argument on this issue, closing statements began. The People made several statements during closing arguments to which Rouse objected. For example, the People stated "I further want to point out that it was Attorney King's Office that referred him to Dr. Lu, and there's a reason he was referred to Dr. Lu by Attorney King's Office"; "So he's referred by Attorney King's office because he would have no other defense to this case other than insanity. He had no option on this case. I also want to address the point about his allegation that Mrs. Rouse had told him that morning that he shot her that Shenovia was not his daughter . . . And I had brought that up with her months ago, I asked her . . . she denied it and that defendant never sought to have this paternity issue resolved"; and "He's only charged with attempted murder. The only reason is that she didn't die. But even though he didn't kill her that day, he has ruined her life. He has ruined

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 13 of 45

2024 VI 4

the life of his daughter. This will be with them forever." (J.A. at 708.) When Rouse objected, curative instructions were given. The morning of the last day of trial, the jury was instructed. (J.A. at 722.)

## II.   DISCUSSION

### A. Issues and Standard of Review

¶21    Rouse first challenges the sufficiency of the evidence to sustain his convictions. When conducting a review of the sufficiency of the evidence, this Court is required to consider all evidence presented, including any evidence that is ultimately determined to be inadmissible. *Fontaine v. People*, 56 V.I. 571, 585 n.9 (V.I. 2012). Because Rouse challenged the sufficiency of the evidence of his sanity by making a motion for judgment of acquittal, this Court exercises plenary review over the denial of such motion and applies the same standard as the trial court. *Stanislas v. People*, 55 V.I. 485, 491 (V.I. 2011); *Prince v. People*, 57 V.I. 399, 405 (V.I. 2012).

¶22    When an appellant seeks to have his conviction overturned for lack of evidence, he bears a heavy burden. *Ritter v. People*, 51 V.I. 354, 359 (V.I. 2009). This " standard of review is formidable and 'defendants challenging convictions for insufficiency of evidence face an uphill battle on appeal.'" *Ubiles v. People*, 66 V.I. 572, 582 (V.I. 2017) (citations omitted). There must be a logical and convincing nexus between the evidence, both direct and circumstantial, and the guilty verdict. *Greer v. People*, 74 V.I. 556, 576 (2021). This Court will affirm such a verdict so long as the evidence, when viewed in the light most favorable to the People — including the benefit of all reasonable inferences — would allow a rational jury to find all elements of each offense proven beyond a reasonable doubt. *Fahie v. People*, 62 V.I. 625, 630 (V.I. 2015).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 14 of 45

2024 VI 4

¶23    In order to sustain the jury's verdict, the credibility of witnesses and the weighing of evidence is not for this Court to second guess on appeal. *Williams v. People*, 55 V.I. 721, 734 (V.I. 2011). Specifically, there is no requirement that the evidence be consistent with only the conclusion of guilt, and the evidence is not insufficient because testimony from witnesses may be in conflict or contradictory, which, in reality, means that the finder of fact made a credibility determination. *Marcelle v. People*, 55 V.I. 536, 547 (V.I. 2011); *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009).

¶24    For his second issue, Rouse challenges the trial court's admission of the testimony of the People's rebuttal expert, Dr. McCormick-McPearce. To the extent that Rouse seeks to argue that Dr. McCormick-McPearce was not qualified as an expert in the subject matter to which she testified, this argument is waived by an explicit concession of her qualifications at the trial. (J.A. at 633 ("I'll accept her as an expert.")) The Court will address the reliability of Dr. McCormick-McPearce's testimony and the fit, as these issues, as to admissibility of this testimony, have not been waived. The trial court's evidentiary determinations, including the admission of expert testimony, are reviewed for abuse of discretion. *People v. Todmann*, 53 V.I. 431, 436 (V.I. 2010); *Mulley v. People*, 51 V.I. 404, 413 (V.I. 2009). Generally, a court abuses its discretion if it acts arbitrarily or irrationally. *Alexander v. People*, 60 V.I. 486, 494 (V.I. 2014) (citing *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012)). The trial court acts arbitrarily or irrationally if its ruling is founded upon "a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact'" or if "its actions were 'clearly contrary to reason and not justified by the evidence.'" *Appleton v. Harrigan*, 61 V.I. 262, 268 (V.I. 2014) (quoting *Stevens v. People*, 55

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 15 of 45

2024 VI 4

V.I. 550, 556 (V.I. 2011)).[1] Furthermore, a court cannot "exercise its discretion" by choosing to ignore a claim or issue that was properly before it. *Bryan v. Fawkes*, 61 V.I. 416, 476 (V.I. 2014) (citing *Garcia v. Garcia*, 59 V.I. 758, 771 (V.I. 2013)). "It is axiomatic that, when a court with discretion fails to balance the pertinent factors required for it to properly exercise that discretion, such failure constitutes an abuse of discretion." *Rivera-Mercado v. Gen. Motors Corp.*, 51 V.I. 307, 330 (V.I. 2009) (Swan, J., concurring); *see Beachside Assocs., LLC v. Fishman*, 53 V.I. 700, 719 (V.I. 2010).

¶25     For his next issue, Rouse argues that the trial court abused its discretion when it refused to grant a mistrial due to the prosecution's improper remarks during opening and closing statements and at other times during the trial. The denial of such a motion is likewise reviewed for abuse of discretion. *John v. People*, 63 V.I. 629, 644-45 (V.I. 2015).

¶26     As his last issue, Rouse challenges the jury instruction stating that, once he introduced some evidence suggesting his actions were a consequence of a mental defect, the People bore the burden of proving Rouse's sanity beyond a reasonable doubt. An asserted error in jury instructions is reviewed for abuse of discretion, if fairly presented at the trial level. *Ostalaza v. People*, 58 V.I. 531, 556 (V.I. 2013); *Jackson-Flavius v. People*, 57 V.I. 716, 721 (V.I. 2012). Jury instructions must fairly and adequately inform the jury of the legal standard by which guilt is to be determined and must contain accurate statements and explanations of any applicable legal principles. *A. Williams*, 55 V.I. at 729. Jury instructions must also conform to the charges in the information and be consistent with the evidence presented. *Id.* (citing *United States v. Martin*, 528 F.3d 746,

---

[1] *See also Smith v. Gov't of the V.I.*, 67 V.I. 797, 803-04 (V.I. 2017); *Billu v. People*, 57 V.I. 455, 461-62 (V.I. 2012) (quoting *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012)); *Pelle v. Certain Underwriters at Lloyd's of London*, 66 V.I. 315, 318 (V.I. 2017); *Gore v. Tilden*, 50 V.I. 233, 236 (V.I. 2008).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 16 of 45

2024 VI 4

752 (10th Cir. 2008)). Importantly, even when a defendant requests specific language for a given jury instruction, the trial court still retains the discretion to determine the language to be used. The trial court's obligation is to correctly state the law and assure that the instruction conveys the required meaning, not to use specific language requested by either side. *Williams*, 55 V.I. at 732.

¶27    Jury instructions must be viewed in their entirety, and the inquiry is whether the instructions on the whole were misleading or inadequate to guide the jury. *Prince*, 57 V.I. at 409. Jury instructions are not to be invalidated unless the instruction substantially and adversely impacted the constitutional rights of the defendant and affected the outcome of the trial. *Id.* at 405. Even when there is a contemporaneous objection to a jury instruction and even if it omits a required element of an offense or defense, it will not justify reversal where the error has not impacted the defendant's rights and is harmless beyond a reasonable doubt. *Id.* An error in jury instructions will only result in reversal of a conviction where: (1) the error was fundamental and highly prejudicial due to its failure to provide the jury with adequate guidance, and (2) this Court's refusal to consider the error would result in a miscarriage of justice. *Williams*, 55 V.I. at 727 (citing *Farrell v. People*, 54 V.I. 600, 618-19 (2011)). Even though a defendant is entitled to an instruction where the factual record contains evidence that is sufficient for a reasonable jury to find in the defendant's favor on an issue, element, or defense, *Prince*, 57 V.I. at 412, and this Court typically reviews a decision to include or exclude a jury instruction for abuse of discretion, *Williams*, 55 V.I. at 727 (citing *Phillips v. People*, 51 V.I. 258, 269 (V.I. 2009)), when a defendant fails to object to or fails to request a jury instruction, the issue is subject to Plain Error Review.[2]

---

[2] *See Cornelius v. Bank of N.S.*, 67 V.I. 806, 816 n.2 (V.I. 2017) (explaining what "Plain Error" and "Plain Error Review" are).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 17 of 45

2024 VI 4

*Id.* (citing *Francis v. People*, 52 V.I. 381, 390 (V.I. 2009); *United States v. Petersen*, 622 F.3d 195, 202 (3d Cir. 2010)).

## B. Jurisdiction

¶28    "Before this Court can decide the merits of [this] appeal, we must determine if we have jurisdiction." *Brown v. People*, 49 V.I. 378, 379 (V.I. 2008); *First Am. Dev. Group/Carib, LLC*, 55 V.I. 594, 601 (V.I. 2011) ("Prior to considering the merits of an appeal, this Court must first determine if it has appellate [subject matter] jurisdiction over the matter." (citing *V.I. Gov't Hosp. & Health Facilities Corp. v. Gov't of the V.I.*, 50 V.I. 276, 279 (V.I. 2008)). We have appellate subject matter jurisdiction over "all appeals from the decisions of the courts of the Virgin Islands established by local law[.]" ACT TO REVISE THE ORGANIC ACT OF THE VIRGIN ISLANDS OF THE UNITED STATES, Pub. L. 517, 68 Stat. 497, 497 (1954) (as amended) (48 U.S.C. § 1613a(d)).

¶29    Pursuant to this grant of authority from Congress, the Legislature of the Virgin Islands has established this Court and granted it jurisdiction over all appeals arising from a "Final Order" of the Superior Court. 4 V.I.C. § 32(a); *see* 4 V.I.C. § 33(a) ("Appealable judgments and orders . . . shall be available only upon entry of final judgment in the Superior Court."); *Enrietto v. Rogers Townsend & Thomas PC*, 49 V.I. 311, 315 (V.I. 2007) (quoting 4 V.I.C. § 32(a)); *Toussaint v. Stewart*, 67 V.I. 931, 939-40 (V.I. 2017) (discussing what constitutes a "Final Order").[3] "'A [Final Order] is a judgment from a court which ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment.'" *Toussaint*, 67 V.I. at 939 (quoting *Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012) (citations omitted)). In a criminal matter, the written judgment

---

[3] *See generally Penn v. Mosley*, 67 V.I. 879, 891 n.4 (V.I. 2017) (discussing the distinctions between a judgment, order, and decree); *Miller v. Sorenson*, 67 V.I. 861, 871-72 (V.I. 2017) (discussing the distinctions between a judgment and decree); *Cianci v. Chaput*, 68 V.I. 682, 688 (V.I. 2016) (quoting *In re Estate of George*, 59 V.I. 913, 919 (V.I. 2013)).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 18 of 45

2024 VI 4

embodying the adjudication of guilt and sentence imposed constitutes the Final Order. *Percival v. People*, 62 V.I. 477, 483 (V.I. 2015) (citing *Cascen v. People*, 60 V.I. 392, 400 (V.I. 2014); *Williams v. People*, 58 V.I. 341, 345 (V.I. 2013)).

¶30 Rouse filed his notice of appeal with this Court on May 23, 2017, and on June 2, 2017, the appeal was held in abeyance pending entry of the Final Order in this matter. (J.A. at 28.) The judgment and commitment was entered on October 6, 2017, following a sentencing hearing on August 25, 2017. (J.A. at 3.) In Rouse's notice of appeal, he states that he is challenging the "May 16, 2017 judgment and order and the conviction dated November 6, 2015." Rouse having prematurely filed his notice of appeal months prior to the Superior Court's entry of the Final Order, V.I.R. APP. P. 5(a)(9), and this Court having held the appeal in abeyance, appellate jurisdiction vested in this Court upon entry of the Final Order on October 6, 2017. V.I. R. App. P. 5(a)(1); *Allen v. HOVENSA, L.L.C.*, 59 V.I. 430, 434 (V.I. 2013); *see* V.I.R. APP. P. 5(a)(4).

## C. Sufficiency of the Evidence

¶31 Because (1) the notice of intent to present an insanity defense filed with the trial court prior to trial was not "evidence" of insanity—under the facts of this case—and Rouse's sanity did not become an element of the crime until Rouse's expert testified as to Rouse's "temporary insanity;" and (2) there was testimony that Rouse demonstrated cognition and awareness of his actions and that Rouse's expert's diagnosis was invalid—indicating that Rouse was sane at the time of the criminal acts for which he was convicted – there was sufficient evidence to support a rational finder of fact concluding that Rouse was sane when he shot Vida.[4] As Rouse frames the issue, we

---

[4] Rouse does not argue that there was insufficient evidence to prove beyond a reasonable doubt any of the non-mens rea elements of Attempted First Degree Murder, 14 V.I.C. §§ 921, 922(a)(1); Unauthorized Possession of a Firearm During a Crime of Violence, 14 V.I.C. § 2253(a); or Third Degree Assault as an act of Domestic Violence, 14 V.I.C. § 297(2); 16 V.I.C. § 91(b)(1); therefore, he has waived these arguments. V.I.R. APP. P. 24(m) ("Issues that were (1)

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 19 of 45

2024 VI 4

must decide whether there was sufficient evidence of Rouse's mental competence—sanity—to have allowed a rational fact finder, upon consideration of everyday experiences and taking the evidence in the light most favorable to the jury verdict, to have found, beyond a reasonable doubt, that Rouse was not acting in consequence of a mental illness when he committed the criminal acts for which he was convicted. Rouse presents two attacks on the prosecution's case in chief in this regard.

¶32    First, he asserts that the filing of a notice of intent to present an insanity defense prior to trial was adequate to rebut the presumption of sanity and to require the prosecution to prove Rouse's sanity in its case-in-chief. This Court's precedent holds that any procedural notice of intent to assert an insanity defense filed prior to trial is designed to give the prosecution "time to prepare to meet the issue," *Nibbs v. People*, 52 V.I. 276, 286 (V.I. 2009), and nothing in the rule or its history indicates that its purpose is to achieve anything other than orderly trial management and "maximum 'truth gathering.'" *Id.* at 288. We have never announced that the mere filing of a notice of intent to assert an insanity defense constitutes evidence that rebuts the presumption of sanity and places the burden on the prosecution to prove the defendant's sanity in its case-in-chief.[5]

---

not raised or objected to before the Superior Court, (2) raised or objected to but not briefed, or (3) are only adverted to in a perfunctory manner or unsupported by argument and citation to legal authority, are deemed waived . . . ."). However, cognizant that insufficient evidence is always Plain Error, the Court, in our analysis of the issues properly presented, has not identified any obvious deficiency as to any individual element of the crimes of which Rouse was convicted, and we see no justification for *sua sponte* invoking Plain Error Review. *See Cornelius*, 67 V.I. at 816-17; *cf. Gov't of the V.I. v. Fredericks*, 578 F.2d 927, 930 (3d Cir. 1978) ("Both parties to this appeal seem to have accepted the trial judge's use of *Currens*[, 290 F.2d 751, 774 (3d Cir. 1961),] language; no objection was raised at trial, and neither party has briefed or argued this issue on appeal. In light of these circumstances, we do not believe that the charge given to the . . . jury contained a fundamental error which this court should raise *sua sponte*." (citing FED R. CRIM. P. 30; *Gov't of the V.I. v. Navarro*, 513 F.2d 11, 16 (3d Cir. 1975)).

[5] *See generally* BLACK'S L. DICT. at 594 ("Evidence is any matter of fact which is furnished to a legal tribunal, otherwise than by reasoning or a reference to what is noticed without proof, as the basis of inference in ascertaining some other matter of fact." (quoting James B. Thayer, *Presumptions and the Law of Evidence*, 3 HARV. L. REV. 141, 142 (1889)); *Id.* ("Evidence, broadly defined, is the means from which an inference may logically be drawn as to the existence of a fact; that which makes evident or plain. Evidence is the demonstration of a fact; it signifies that which demonstrates, makes clear, or ascertains the truth of the very fact or point in issue, either on the one side or on the

Indeed, the notice is not evidence, "something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact" or "the collective mass of things, esp. testimony and exhibits, presented before a tribunal in a given dispute." BLACK'S LAW DICTIONARY 595 (8th ed. 2004); *cf.* V.I.R. EVID. 401 (declaring evidence to be relevant if it "has any tendency to make a fact more or less probable" and that "fact is of consequence in determining the action'). Furthermore, the instructions to the jury made clear what in the trial was, and was not, evidence, clearly indicating that statements and filings by a party's attorney are not evidence. Even more to the point, this Court has rejected the rule that an attorney's unsworn representations to the court constitute evidence. *See Henry v. Dennery*, 55 V.I. 986, 994 (V.I. 2011) ("[I]n-court statements by attorneys acting as advocates are not evidence." (citations omitted)). Therefore, Rouse's argument that the evidence of his sanity was insufficient because the Government failed to prove this fact beyond a reasonable doubt in its case in chief is facetious—the notice of insanity defense was not evidence. It could not, and did not, affect the burdens of production and persuasion borne by the litigants.

¶33     Rouse's second argument as to the asserted insufficiency of the evidence in the prosecution's case-in-chief is that, even if the pre-trial filing of the notice of intent to assert an insanity defense was not adequate to rebut the presumption of sanity codified in section 14 of title 14 of the Virgin Islands Code, cross-examination of the witnesses called in the prosecution's case-in-chief presented "some evidence" of Rouse's insanity, thus rebutting the presumption of sanity and requiring the prosecution to establish Rouse's sanity beyond a reasonable doubt in its case in

---

other. In the legal acceptation, the term 'evidence' includes all the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved. 'Evidence' has also been defined to mean any species of proof legally presented at the trial of an issue, by the act of the parties and through the medium of witnesses, records, documents, concrete object, and the like." (quoting 31A C.J.S. *Evidence* § 3, at 67-68 (1996)).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 21 of 45

2024 VI 4

chief.[6] (App. Br. at 11 ("Despite the lay witness testimony proximate to the time of the shooting and the medical records that supported Defendant's theory of mental illness, the People rested its case, without presenting any evidence of sanity.")).

### 1. Sufficiency of the Evidence: Rouse's Sanity as Supported by the Evidence in the Prosecution's Case-in-Chief

¶34    The Legislature of the Virgin Islands has declared that "all persons are capable of committing crimes or offenses . . . ." 14 V.I.C. § 14. "Crime" and "offense" are defined to be the same thing, "an act committed or omitted in violation of a law of the Virgin Islands and punishable by (1) imprisonment; or (2) fine; or (3) removal from office; or (4) disqualification to hold and enjoy any office of honor, trust, or profit." 14 V.I.C. § 1.[7] A "person," as used in this provision of the Virgin Islands Code, means a human being. *Ubiles*, 66 V.I. at 592 (citing COMPACT AM. DICTIONARY: A CONCISE DICTIONARY OF AM. ENGLISH 920 (1998)).

¶35    Taking the plain language of section 14 of title 14, it is clear that the Legislature has codified the common law presumption that all natural persons are presumed to be in control of

---

[6] *See Downey*, 396 F. Supp. at 355 ("It is well recognized that either a jury or a court sitting without a jury need not determine the issue of sanity in a criminal case from the opinion of experts alone, but rather should decide the case on all the evidence adduced at trial." (citing *United States v. Ross*, 468 F.2d 1213, 1215 (9th Cir. 1972)); *cf. Davis v. United States*, 160 U.S. 469, 377 (1895) ("Whenever, by the testimony, the question of insanity is raised, then the fact of sanity, as any other essential fact in the case, must be established to the satisfaction of the jury beyond a reasonable doubt.").

[7] This provision was based on section 3 of chapter 1 of Title IV of the 1921 Codes, which provided as follows:

> Section 3.—A crime or public offense is an act committed or omitted in violation of a law forbidding or commanding it and to which is annexed, upon conviction, any of the following punishments:
> First.—Imprisonment;
> Second.—Fine;
> Third.—Removal from office; or,
> Fourth.—Disqualification to hold and enjoy any office of honor, trust, or profit.

Code 1921, Title IV, Ch. 1, § 3.

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 22 of 45

2024 VI 4

their actions and have the mental ability to understand what is right and wrong—they are presumed to be sane. 14 V.I.C. § 14; *Nibbs*, 52 V.I. at 284 ("Although a defendant is ordinarily presumed sane, once some evidence of insanity is introduced, the prosecution has the burden of proving sanity beyond a reasonable doubt." (quoting *Gov't of the V.I. v. Webbe*, 821 F.2d 187, 189 (3d Cir. 1987), and citing *Gov't of the V.I. v. Knight*, 989 F.2d 619, 626 (3d Cir. 1993); *Gov't of the V.I. v. Bellott*, 495 F.2d 1393, 1397 (3d Cir. 1974)).[8]

¶36    In a criminal prosecution, under the reasonable doubt standard, a criminal defendant "is entitled to an acquittal of the specific crime charged if, upon all the evidence, there is a reasonable doubt whether he was capable in law of committing the crime." *Davis v. United States*, 160 U.S. 469, 484 (1895);[9] *Gov't of the V.I. v. Fredericks*, 578 F.2d 927, 929 (3d Cir. 1978) ("Under Virgin

---

[8] *See also Webbe*, 821 F.2d at 189 (citing *Davis*, 160 U.S. 469; *United States v. Lutz*, 420 F.2d 414 (3d Cir. 1970)); *Gov't of the V.I. v. Rodriguez*, 423 F.2d 9, 12 (3d Cir. 1970) ("'A statute is simply a fresh particle of legal matter dropped into the previously existing ocean of law. It is subject to all the old attractions, and the old winds and lunar influences, precisely as were the several particles of the ocean before. Or, to speak without metaphor, the new statutory rule is to be limited, extended, and governed by the same common-law principles, and to the same extent, as were common-law rules themselves before the statute was passed." (citation omitted); *see generally Commonwealth v. Kostka*, 350 N.E.2d 444, 452 (Mass. 1976) ("That the prosecution may rely on the presumption [of sanity] in the absence of any evidence tending to show insanity is the rule in all jurisdictions. . . . [A]ll jurisdictions consider insanity to be a defense and apply the 'presumption of sanity' in a manner that makes it conclusive on the issue of sanity until some evidence tending to show insanity is adduced . . . ." (citations omitted)).

[9] The holding of *Davis* was explained by the Supreme Court, stating, "After *Davis*, if a federal defendant introduced sufficient evidence to raise a reasonable doubt as to his sanity, it was sufficient to create a question for the jury on which the Government bore the ultimate burden of persuasion beyond a reasonable doubt." *Dixon v. United States*, 548 U.S. 1, 11-12 (2006) (*citing Hall v. United States*, 295 F.2d 26, 28 (4th Cir. 1961); *Holloway v. United States*, 148 F.2d 665, 666 (D.C. Cir. 1945); *Post v. United States*, 135 F.1, 10 (5th Cir. 1905)). This is reflective of

> the humane principle, existing at common law and recognized in all the cases tending to support the charge below, that 'to make a complete crime cognizable by human laws, there must be both a will and an act'; 'as a vicious will without a vicious act is no civil crime, so, on the other hand, an unwarrantable act without a vicious will is no crime at all. So that, to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act, consequent upon such vicious will.'

*Davis*, 160 U.S. at 484 (citations omitted); *see also Morissette*, 342 U.S. at 250 ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 23 of 45

2024 VI 4

Islands law, 'persons who are mentally ill and who committed the act charged against them in consequence of such mental illness' are not considered capable of committing a crime." (quoting 14 V.I.C. § 14(4))). However, in deciding if there is a reasonable doubt as to a defendant's capacity to form the requisite criminal intent, i.e., mens rea, there is a "presumption which the law, justified by the general experience of mankind, as well as by considerations of public safety, that indulges in favor of sanity." *Davis*, 160 U.S. at 486.

¶37 The sanity presumption relieves the prosecution of the burden "to include as an element of every criminal charge an allegation that the defendant had such a capacity." *Clark v. Arizona*, 548 U.S. 735, 766-67 (2006). Therefore, in practical operation, the "Some Evidence Rule" allows the prosecution to avoid proving the defendant's sanity beyond a reasonable doubt until there is admitted in the record "evidence to the extent necessary to raise a doubt, which upon consideration of the entire evidence was a reasonable one," as to the defendant's sanity. *Gov't of the V.I. v. Smith*, 278 F.2d 169, 219 (3d Cir. 1960) ("The defendant . . . [need] only produce sufficient evidence to raise a reasonable doubt in the minds of the jury." (quoting *People v. Hardy*, 198 P.2d

individual to choose between good and evil."); *Rodriguez*, 423 F.2d at 11 ("It early became established at common law that an essential ingredient of a crime was the existence of a guilty mind, a mens rea, as well as the act itself, actus rea." (citing sources in footnote 4)). While *Davis* was subsequently overruled by statute, *Id.* at 12 (and replaced with a statute requiring the defendant to prove insanity by clear and convincing evidence), the rule articulated therein is the rule adopted in this Territory. *See Nibbs*, 52 V.I. at 291 ("[U]nder Virgin Islands law, once some evidence of insanity is introduced, the People have 'the burden of proving beyond a reasonable doubt that the offense was not the consequence of a mental illness.'" (quoting *Webbe*, 821 F.2d at 189); *see also Matheson v. United States*, 227 U.S. 540, 543 (1912) (noting that a jury could not convict a defendant "if they had a reasonable doubt as to [the defendant's] sanity" (citing *Davis*, 160 U.S. 469)); *Bellott*, 495 F.2d at 1395-96 ("Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime [or punishment thereof]. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond a reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond a reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged." (quoting *Davis*, 160 U.S. at 486-88)).

865, 872 (Cal. 1948)). "Whether that doubt, in light of the . . . evidence, was a reasonable one [is] for the trier of facts . . . to determine." *Smith*, 278 F.2d at 219.

¶38    The general rule is that "**properly qualified** lay witnesses may testify as to the sanity of an accused and that such testimony is sufficient to satisfy the burden of the prosecution even though there is contrary expert opinion." *Bellott*, 495 F.2d at 1397 (emphasis added) (citing *Dusky v. United States*, 295 F.2d 743 (8th Cir. 1961) (Blackmun, J.)); *Fredericks*, 578 F.2d at 932 ("The decision of whether a defendant is affected by a mental disease or defect rests with the jury's evaluation of all lay and medical evidence in the case." (citations omitted)). In order to be properly qualified, the lay witness' opinion must "be rationally based on the witness' perception [supported by] firsthand knowledge of the factual predicates that form the basis for the opinion." *Knight*, 989 F.2d at 629 (citing FED. R. EVID. 701(a) (for a lay witness, "testimony in the form of an opinion is limited to one that is: (a) rationally based on witness' perception")).[10]

¶39    Further, "[i]nsanity '. . . assumes as many and various forms as there are shades of difference in the human character.' It is, as has been well said, 'a condition which impresses itself as an aggregate on the observer,' and the opinion of one, personally cognizant of the minute circumstances making up that aggregate, and which are detailed in connection with such opinion, is, in its essence, only fact 'at short-hand.'" *Connecticut Mut. Life Ins. Co. v. Lathrop*, 111 U.S. 612, 620 (1884).[11] Therefore, "if circumstances can be presented with greater clarity by stating an

---

[10] *Cf.* V.I.R. EVID. 701(a); *see generally Tot*, 319 U.S. at 467 ("The jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference." (citing *Wilson v. United States*, 162 U.S. 613, 619 (1896)).

[11] *See also Lathrop*, 111 U.S. at 620 n.1 (citing *Clary v. Clary*, 24 N.C. 78, 83 (N.C. 1841); *Dunham's Appeal*, 27 Conn. 193 (Conn. 1858); *Grant v. Thompson*, 4 Conn. 203 (Conn. 1822); *Hardy v. Merrill*, 56 N.H. 227 (N.H. 1875); *Boardman v. Boardman*, 47 N.H. 120 (N.H. 1875); *State v. Pike*, 49 N.H. 399 (N.H. 1870); *State v. Archer*, 54 N.H. 468 (N.H. 1874); *Hathaway's Adm'r v. Nat. Life Ins. Co.*, 48 Vt. 350 (Vt. 1875); *Morse v. Crawford*, 17 Vt. 499 (Vt. 1845); *Clark v. State*, 12 Ohio 483 (Ohio 1843); *Gibson v. Gibson*, 17 Tenn. 329 (Tenn. 1836); *Potts v. House*, 6 Ga. 324 (Ga. 1849); *Vanauken's Case*, 2 Stockt. Ch. 190; *Brooke v. Townshend*, 7 Gill. 10 (Md. Ct. App. 1848); *DeWitt*

opinion, then that opinion is helpful to the trier of fact." *Knight*, 989 F.2d at 630 (citing *United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982)).[12]

¶40　Reviewing the testimony, the following facts appear to support Rouse's argument. Vida testified that, after he had shot her, Rouse was acting erratically or hysterically and "cranked" the gun in an attempt to shoot Vida a second time. Officer Woodley-Blyden testified that, upon her arrival at the scene of the shooting, she observed Rouse "racking" the gun and alternating between pointing the gun in his mouth and pointing it to the side of his head; as the officer described it, "he just had to shoot her and then he was going to kill himself." She also stated that Rouse "didn't seem to be all there," but her distinct impression was that Rouse was depressed. Officer Serrano confirmed these actions by Rouse. Sergeant. Krigger also confirmed these actions by Rouse and likewise believed Rouse intended to kill himself. Sergeant Krigger also testified that, at times, Rouse spoke in partial sentences and repeated himself, but the sergeant maintained that Rouse was "calm. He was clear. He was fluid." The sergeant confirmed a second time that Rouse appeared to be thinking clearly. However, when pressed, Krigger testified that Rouse "appeared to be somebody who had a lot on his mind" and "was not thinking clearly"; therefore, Krigger did his "job to keep [Rouse] focused."

---

v. *Barly*, 17 N.Y. 342 (1858)); *Hewlett v. Wood*, 55 N.Y. 634 (N.Y. 1873); *Clapp v. Fullerton*, 34 N.Y. 190 (N.Y. 1866); *Rutherford v. Morris*, 77 Ill. 397 (Ill. 1875); *Duffield v. Morris' Ex'r*, 2 Del. 384 (Del. 1838); *Wilkinson v. Pearson*, 23 Pa. 119 (Penn. 1854), *Pidock v. Potter*, 68 Pa. 342 (Penn. 1871); *Doe v. Reagan*, 5 Blackf. 218 (Ind. 1839); *Dove v. State*, 50 Tenn. 348 (Tenn. 1871); *Butler v. St. Louis Life Ins. Co.*, 45 Iowa 93 (Iowa 1876); *People v. Sanford*, 43 Cal. 29 (Cal. 1872); *State v. Klinger*, 46 Mo. 229 (Mo. 1870); *Holcomb v. State*, 41 Tex. 125 (Tex. 1874); *McClackey v. State*, 5 Tex. App. 320 (Tx. Ct. App. 1878); *Norton v. Moore*, 40 Tenn. 480, 482 (Tenn. 1859); *Powell v. State*, 25 Ala. 28 (Ala. 1854); *May v. Bradlee*, 127 Mass. 414 (Mass. 1879); *Commonwealth v. Sturtivant*, 117 Mass. 111 (Mass. 1875).

[12] *Cf.* V.I. R. EVID. 701(b) (For a lay witness, "testimony in the form of an opinion is limited to one that is: . . . (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 26 of 45

2024 VI 4

¶41    In contrast to this evidence, Officer Woodley-Blyden testified that Rouse "just seemed upset or depressed." Sergeant Krigger, in addition to maintaining that Rouse appeared to be thinking clearly, testified that Rouse was upset because Rouse believed Vida was going to tell him one of their children was not his, after 24 years, and that he had just returned to the island and was shocked Vida still intended to divorce him.

¶42    The evidence was in equilibrium as to Rouse's sanity at this juncture, and when the evidence presents two possible versions of the facts, a finding as to one is not irrational or clearly erroneous. *See Nicholas v. People*, 56 V.I. 718, 741-42 (V.I. 2012).[13] It is possible that the jury could have concluded, based on the testimony of Officer Woodley-Blyden and Sergeant Krigger, that Rouse was suicidal and depressed and not thinking clearly, and this could have raised a question as to a defendant's sanity. However, the testimony also justified a finding of fact—based on testimony that Rouse engaged in cognitive processes in deciding not to shoot his daughter and that Rouse expressed anger that Vida was going to leave him after such a long marriage—that Rouse's actions were motivated by anger and jealousy that his wife was utterly unhappy in their marriage and was, in fact, going to end the marriage that day.[14] On this record, "the government had, without any resort to expert testimony, sustained its burden with considerable lay witness testimony, at least sufficient to withstand a Rule 29(a) motion for judgment of acquittal." *Downey*, 396 F. Supp. at 353.

---

[13] *See also Penn*, 67 V.I. at 893 ("[T]he Appellate Division considered Penn's alternative testimony and recognized that the magistrate chose one of two versions of the competing testimonies."); *State v. Bay*, 722 P.2d 280, 284 (Ariz. 1986) ("This is so because a jury need not believe or accept as true the testimony of experts over lay counterparts.").
[14] *E.g.*, *Webbe*, 821 F.2d at 190-91 ("The district court's conclusion that [the defendant] was not acting in consequence of his mental illness is buttressed by its further findings that his purposeful behavior after the killing suggests that he was not delusional at this time. The court further supported its conclusions by noting that there was an adequate explanation for [the defendant's] conduct separate and apart from his mental illness: he might have killed his wife because of feelings of jealousy and rejection."); *Gov't of the V.I. v. Crowe*, 391 F. Supp. 987, 990 (D.V.I. 1975).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 27 of 45

2024 VI 4

### 2. Sufficiency of the Evidence: Rouse's Sanity as Supported by the Totality of the Evidence Presented at Trial

¶43     The Court next considers whether the People presented adequate evidence that either Rouse was not suffering from a mental illness or that Rouse's actions were not a product of that mental illness. *King v. People*, 67 V.I. 903, 909 (V.I. 2017) ("[T]he People must prove beyond a reasonable doubt that the defendant either did not suffer from a mental illness, or was not acting as a result of his mental illness when he committed the charged offense, i.e., the People must prove beyond a reasonable doubt that the defendant was sane when he or she committed the offense." (citations omitted)).[15]   Rouse vociferously asserts that the failure of the prosecution's expert to evaluate Rouse undermines the probative value of that expert testimony such that there was insufficient evidence establishing Rouse's sanity beyond a reasonable doubt.

¶44     To reiterate, section 14 of title 14 is the Legislature's statutory codification of the common law presumption of sanity and dictates that, in a criminal case, the presumption of the defendant's sanity remains unrebutted until there is record evidence indicating that the alleged actions were taken as a consequence of mental illness. 14 V.I.C. § 14(4); *Nibbs*, 52, V.I. at 291 n.9.[16]   However, "in addition to establishing sanity through the testimony of lay witnesses whose observations of the defendant are proximate to the homicide, the Government may rebut the opinion evidence introduced by the defense." *Downey*, 396 F. Supp. at 355 (citing *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967)).

---

[15] *See Nibbs*, 52 V.I. at 292 ("Under Virgin Islands law, once some evidence of insanity is introduced, the People have 'the burden of proving beyond a reasonable doubt that the offense was not the consequence of a mental illness.'" (quoting *Webbe*, 821 F.2d at 189)).

[16] *See also Crowe*, 391 F. Supp. at 990 ("The Virgin Islands Code requires not only that the defendant be mentally ill, but additionally that there be a sufficient nexus, or causative link, between the mental disease and the act in question.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 28 of 45

2024 VI 4

¶45　Of Rouse's five character witnesses who had all known him for twenty years or longer, none testified that Rouse had a history of mental illness, and St. Claire David specifically testified that he had never known Rouse to have any mental illness. Similarly, Vida testified that, in their 34 years of marriage, she had never known Rouse to suffer from a mental illness.[17] Additionally, the shooting occurred on the day on which Vida and Rouse were scheduled to attend court and finalize their divorce. Vida further testified that, though she and Rouse had conflicting viewpoints on the various topics they had discussed the morning of the shooting, the argument was "not a real argument" and would not have provoked Rouse into anger.[18] As to Rouse's testimony, he admitted to having a detailed memory of the events leading to the shooting.

¶46　Sergeant Krigger's testimony confirmed that Rouse had shot himself after Vida and her daughters fled the bedroom for safety. The police arrived while Rouse was sitting on the bed attempting to load ammunition in the chamber of the firearm. Throughout the 30-minute ordeal, Rouse was calm, clear, and fluid. He maintained a conversation with the officer, who in turn, when specifically questioned whether Rouse in any way appeared incoherent, responded that Rouse's mental condition was "clear." Indeed, in response to defense counsel's question "Isn't it true that he did not seem to be a person who was all there," the officer responded that Rouse "appeared to be somebody who had a lot on his mind." During this interaction, the officer observed

---

[17] *Cf. Downey*, 396 F. Supp. at 355-56 ("Other than a history of alcoholism, there is no indication in the record that the defendant had ever suffer any mental illness or disease prior to the incident for which he stands charged.").

[18] *Cf. Downey*, 396 F. Supp. at 356 ("An important factor in my unwillingness to accept the expert opinions is that [his wife's] infidelity and the concomitant affront to defendant's masculinity (already damaged by business failings), to which [defendant's expert] attribute the actual triggering of the insanity, also supply a motive for the killing.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 29 of 45

2024 VI 4

Rouse point the firearm at himself twice and at Sergeant Krigger twice, but he did not pull the trigger, indicating four separate instances of cognition.[19]

¶47 It is true that Dr. Lu linked the shooting and stated that "the shooting appears to be a consequence of his frustration, anger and his pent up feeling and he slipped into that kind of dissociative state of mind and as a result of that he decided to kill himself and kill her to avoid from the divorce proceeding." However, Dr. McCormick-McPearce testified that Dr. Lu's diagnosis of a "dissociative state" was not a valid medical diagnosis. Additionally, she testified that the experiences upon which Dr. Lu based his conclusion were not dissociative experiences. Furthermore, Rouse lacked any of the historical indicators of suffering from dissociative states triggered by stress. She explained that people who experience dissociative states will typically have an ongoing course of these episodes in their past during high-stress times. Likewise, people who experience dissociative states generally have a history of severe childhood trauma, sexual or otherwise.

¶48 Additionally, at the time of the shooting, Rouse displayed moments of cognition that would not have occurred when a person is in a dissociative state. Dr. McCormick-McPearce gave as an example the fact that Rouse pointed the gun at this daughter but decided not to shoot. Similarly, Rouse pointed the gun at the officer twice and chose not to shoot. Rouse's choice to shoot himself was also indicative of cognition and experiencing remorse, which would not occur in a person who

---

[19] *Webbe*, 821 F.2d at 190-91 ("The district court's conclusion that [the defendant] was not acting in consequence of his mental illness is buttressed by its further findings that his purposeful behavior after the killing suggests that he was not delusional at this time. The court further supported its conclusions by noting that there was an adequate explanation for [the defendant's] conduct separate and apart from his mental illness: he might have killed his wife because of feelings of jealousy and rejection."); *Crowe*, 391 F. Supp. at 990 ("[T]he cognitive process and conduct involved in defendant's decisions first to avenge the death of Dr. King by slaying a white man, then discerning that the Spanish individual he confronted was not a suitable victim, and ultimately finding a victim who did conform to his retaliatory plan, all suggested" that the defendant's actions were not a result of psychosis.).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 30 of 45

2024 VI 4

was in a dissociative state. The People's expert further explained that Dr. Lu's diagnosis was problematic because he had obtained Rouse's version of events months after the shooting. Her ultimate conclusion was that Dr. Lu's diagnosis was neither valid nor reliable.[20]

¶49 Certainly the testimony of Vida, Shenovia, and Krigger paints a picture of a man who was angry and upset and shot his wife, who intended to divorce him that day after decades of marriage. Furthermore, as much as defense counsel emphasized Rouse's lack of coherence at the time of arrest, the officers who witnessed Rouse at that time testified that Rouse was clear and coherent and specifically answered in the negative to defense counsel's leading questions that were calculated to elicit their perceptions of Rouse's mental state as being clouded. Beyond the lay testimony showing that Rouse was coherent and logical, even if upset, at the time of shooting, Dr. Lu's own testimony presented grounds for doubt. While Rouse maintained that he did not have any feelings about the divorce, Dr. Lu emphasized that Rouse was upset by this. Further, Dr. Lu stated that he believed 50% of Rouse's problems were a result of long-term alcohol abuse. Considering the foregoing, the jury had a factual basis from which it could readily have rationally

---

[20] *See Kostka*, 350 N.E.2d at 457 ("'The jury are . . . the sole judges of the credibility and weight of all the evidence on the issue of sanity . . . . The jury are not compelled to believe any such testimony or opinions, and the court cannot order them to do so by directing them to return verdicts of not guilty by reason of insanity . . . . The law should not, and does not, give the opinions of experts on either side of the issue the benefit of conclusiveness, even if there are no contrary opinions introduced at trial.'" (quoting *Smith*, 258 N.E.2d at 19)); *cf. Downey*, 396 F. Supp. at 355 ("'Expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, the reasoning by which he progresses from his material to his conclusion, the interest or bias of the expert, inconsistencies or contradictions in his testimony as to the material matters, material variations between the experts themselves, and the defendant's lack of cooperation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened when it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross-examination of the expert may be such as to justify the trier of facts not being convinced by him." (quoting *Mims*, 375 F.2d at 143-44, and citing *McCracken*, 488 F.2d at 410)).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 31 of 45

2024 VI 4

and logically concluded, in light of common sense and everyday experience, that Rouse was sane when he shot Vida. [21] Accordingly, the conviction is affirmed.

### D. Alleged Late Disclosure of the Prosecution's Expert Witness

¶50    Because the Superior Court's reasons justifying the allowance of the late disclosure of the People's expert report were adequate and no showing of prejudice was made, the trial court's denial of Rouse's motion to exclude the testimony of the People's rebuttal expert was not an abuse of discretion. Similarly, because the testimony of the People's rebuttal expert was based upon reliable methodology and facts and the testimony "fit," i.e., was relevant, to the facts and issues to be decided in this matter, the trial court did not abuse its discretion when it allowed Dr. McCormick-McPearce's testimony as the People's rebuttal expert. The rule announced in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993),[22] states that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit[, also termed relevance]," and the trial judge, upon proper objection, must evaluate these factors prior to expert testimony being presented to the jury. *Hodge v. Bluebeard's Castle, Inc.*, 62 V.I. 671, 693 (V.I. 2015) (quoting

---

[21] *Cf. Bellott*, 495 F.2d at 1397-98 ("Since the experts conceded that if the factual premises were incorrect their opinions would be different[,] there is ample evidence from which reasonable men could have rejected their opinions entirely.").

[22] In *Antilles School, Inc. v. Lembach*, this Court held that, following the adoption of the Federal Rules of Evidence in the Virgin Islands, when Act 7161 went into effect, the standard articulated in *Daubert*, 509 U.S. 579, was the standard by which the rules governing the admissibility of expert testimony were to be applied and judged. 64 V.I. 400, 415 (V.I. 2016) (citing Act No. 7161, § 15(b) (Apr. 7, 2010)). In *Edward v. GEC, LLC*, this Court further acknowledged that both Federal Rule 702 and Virgin Islands Rule 702 enunciate the same standard. 67 V.I. at 762 n.6 ("By its own terms, then, Rule 702—and by extension, the *Daubert* standard, which was expressly implemented in the current language of Rule 702—is concerned with qualifications, knowledge, methodology, and so forth of the witness who will actually testify at trial."); *see* S. Ct. Prom. Order 2017-0002 (Apr. 3, 2017) (adopting Virgin Islands Rules of Evidence). Therefore, the *Daubert* standard is currently the rule applied in the court of the Virgin Islands when determining whether to admit or exclude expert opinions. *See generally Todmann*, 53 V.I. at 439-40 (Under former 5 V.I.C. § 771(2) and 777(f), requiring that "all relevant evidence is admissible" and defining relevant evidence to be "evidence having any tendency in reason to prove any material fact," and Federal Rule of Evidence 702's "assist the trier of fact" requirement, the standards are equivalent with the focus of the inquiry being relevance of the proposed testimony.).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 32 of 45

2024 VI 4

*Bluebeard's Castle, Inc. v. Hodge*, 51 V.I. 672, 693-94 (D.V.I. App. Div. 2009)).[23] While these requirements are mandatory, a party waives any objection to any of the three factors if he fails to timely assert the objection "because 'the truth-seeking function of litigation is best served by orderly progression, and because *Daubert* generally contemplates a 'gatekeeping' function, not a 'gotcha' function." *Edward v. GEC, LLC*, 67 V.I. 745, 760 (V.I. 2017) (quoting *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001)). As such, this standard is not to be applied or interpreted in a manner that rewards or encourages "trial by ambush." *Id.* at 761 (citing *Alfred*, 262 F.3d at 1087)).

¶51    Stating his objection, Rouse's counsel explained as follows, "Your Honor, the issue is not whether it's relevant or critical. The issue is whether or not the government complied with this court's orders and complied with the rules, and it is clear that it has not." (J.A. at 187.) The trial court rejected Rouse's objection to the timing of the production of Dr. McCormick-McPearce's curriculum vitae on October 2, 2015, and her report on October 7, 2015, when jury selection was scheduled to commence on November 3, 2015. Having reviewed the transcript of the pre-trial conference, the court found that the People had provided sufficient explanation for the late disclosure of the expert report and supporting documents. Furthermore, the People had represented that the documents would be provided within a week of the pre-trial conference, and the People

---

[23] *See generally Lembach*, 64 V.I. at 416 ("A trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge [**"Qualification"**] that (2) will assist the trier of fact to understand or determine a fact in issue [**"Fit/Relevance"**]. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [**"Reliability"**] and of whether that reasoning or methodology properly can be applied to the facts in issue [**"Fit/Relevance"**]." (quoting *Daubert*, 509 U.S. at 592-93 (emphasis added))); *Samuel v. United Corp.*, 64 V.I. 512, 523 (V.I. 2016) ("The superior Court must assess the qualification of the expert, the reliability of her methods, and whether her proposed testimony fits the facts of the case in such a way that her testimony will assist the jury in determining an issue of fact." (citing *Bluebeard's Castle*, 62 V.I. at 693)); *Todmann*, 53 V.I. at 440 ("[T]he assist the trier of fact requirement embodied in FRE 702, but excluded from 5 V.I.C. § 911(2), is equivalent to a requirement of relevance.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 33 of 45

2024 VI 4

complied with that deadline. Additionally, Rouse failed to object to the disclosure at that time and did not request a *Daubert* hearing. Considering these facts and the similar subject matter contained in the report of Rouse's own expert, the court found that there was no undue prejudice and denied the motion to exclude, stating that Dr. McCormick-McPearce "will be able to testify in whatever fashion the People decide to use her." (J.A. at 198.)

¶52  On appeal, while dedicating more than three pages of his brief to stating the standard by which the admissibility of expert testimony is determined, Rouse presented his argument as to the late disclosure in one short paragraph, the main point of which was that "the People retained the services of Dr. Laurie McCormick-McPearce, on the eve of trial to critique the expert report of Dr. Lu." As at the trial level, Rouse failed to articulate how his defense was prejudiced by the timing of this disclosure. Rouse had three weeks during which his expert had the opportunity to review Dr. McCormick-McPearce's report and identify any prejudice as to the timing creating an inability to evaluate and respond to the opposing report. Having failed to file a motion demanding a *Daubert* hearing and having failed to establish how his trial strategy would have been different or how the outcome of the trial was affected, Rouse has failed to demonstrate that the trial court acted arbitrarily or irrationally and abused its discretion when it denied Rouse's motion to exclude Dr. McCormick-McPearce's testimony on the basis of the timing of its disclosure. Rouse has also presented further arguments as to the *Daubert* factors, which we now address.[24]

¶53  Expert testimony must be based on the expert's own specialized knowledge. *Suarez v. Gov't of the V.I.*, 56 V.I. 754, 761 (V.I. 2012); cf. *Jackson-Flavius*, 57 V.I. at 731 ("[T]estimony cannot be regarded as lay opinion if it is based on scientific, technical, or other specialized

---

[24] Rouse also presented a conclusory argument that the trial court improperly admitted in evidence Dr. McCormick-McPearce's report. However, this was excluded and, as such, cannot be a basis for a claim or error. (J.A. at 636.)

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 34 of 45

2024 VI 4

knowledge." (quoting FED. R. EVID. 701; *United States v. DeMuro*, 677 F.3d 550, 561 (3d Cir. 2012))). The requirement that an expert possess "**qualifications**" mandates that the witness possess specialized expertise on the subject to which the expert is expected to testify, and this rule is construed liberally, "relaxing the traditional barriers to 'opinion' testimony." *V.I. Waste Mgmt. Auth. v. Bovoni Investments, LLC*, 61 V.I. 355, 369 n.14 (V.I. 2014) (citations omitted). When a witness testifies, if that testimony is an opinion based on matters "within the scope of [the expert's] special knowledge, skill, experience, or training," the witness is testifying as an expert. *Ritter*, 51 V.I. at 366 (holding that former 5 V.I.C. § 911(1), (2) incorporated the same standard of Federal Rule of Evidence 701 precluding a witness being presented as a lay witness when the testimony will be "within the scope of the special knowledge, skill, experience or training possessed by the witness."); *see also Charles v. People*, 60 V.I. 823, 840-41 (V.I. 2014); *Mulley*, 51 V.I. at 418.

¶54    For example, a doctor's testimony regarding the life-threatening nature of an injury is expert testimony. *Ritter*, 51 V.I. at 365 (collecting cases). In contrast, the consideration of the age of a mark or bruise on a person's body, whether the bruise or mark is "fresh"—does not require scientific, technical, or specialized knowledge; "such injuries are common to the average adult, who during a lifetime will become familiar with bruises and cuts upon the human body." *Jackson-Flavious*, 57 V.I. at 732 (citing *J.C. v. State*, 892 S.W.2d 87, 88-89 (Tex. App. 1995); *State v. Thacker*, No. 04CA18, 2005 WL 635044, at *4 (Ohio Ct. App. Mar. 16, 2005) (unpublished)).

¶55    The purpose for considering "**reliability**," "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology can be applied to the facts in issue," "is to ensure that when experts 'testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Suarez*, 56 V.I.

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 35 of 45

2024 VI 4

at (quoting *Daubert*, 509 U.S. at 592-93; *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). An expert's opinion is reliable "if it is based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Samuel v. United Corp.*, 64 V.I. 512, 526 (V.I. 2016) (quoting *Walker v. Gordon*, 46 Fed. Appx. 691, 694 (3d Cir. 2002)).

¶56      Assessing reliability requires consideration of factors such as whether the opinion can be (and has been) tested, whether the theory or technique has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the operation of the technique, and other similar factors relevant to the particular subject matter. *Antilles School, Inc. v. Lembach*, 64 V.I. 400, 416 n.6 (V.I. 2016) (citing *Daubert*, 509 U.S. at 593-94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-51 (1999)). Indeed, Rule 703 permits an expert to testify to opinions based "on facts or data in the case that . . . need not be admissible for the opinion to be admitted' but prohibits any mention of the unadmitted or inadmissible facts or data, unless the trial judge expressly finds that the 'probative value in helping the jury evaluate the opinion substantially outweighs the prejudicial effect." *Alexander*, 60 V.I. at 506. Stated more succinctly, an expert witness is prohibited from serving as a conduit for the recitation of inadmissible evidence. *Id.* Likewise, an expert witness is precluded from intruding "into an area consigned exclusively to the jury," such as a credibility determination. *Id.* (citations omitted).

¶57      Ultimately, in the analysis for relevance, or "**fit**," the trial judge is entitled, when the circumstances justify it, to conclude that "there is simply too great an analytical gap between the data and the opinion offered.'" *Suarez*, 56 V.I. at 761 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Despite Rouse's arguments to the contrary, Dr. McCormick-McPearce's

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 36 of 45

2024 VI 4

methods were neither unreliable nor irrelevant. Based on her expert qualifications, Dr. McCormick-McPearce reviewed the report of Rouse's own expert and considered those facts that were reported therein in light of her training, experience, etc. Dr. McCormick-McPearce worked from Dr. Lu's summary of facts that formed the basis for Rouse's own expert report opining that Rouse acted while under the influence and as a consequence of a mental illness.

¶58   Accordingly, while Rouse argues that these facts form an unreliable basis for Dr. McCormick-McPearce's opinion, this is simply ludicrous. Dr. McCormick-McPearce fully explained why she felt the facts, as reported by Rouse's expert, did not constitute a basis for concluding that Rouse was in a dissociative state at the time of the shooting and further explained facts in Dr. Lu's report that directly undermined any such conclusion, and she did so based on valid medical criteria as articulated in the diagnostic and statistical manual, an accepted medical text utilized for diagnosis. Dr. McCormick-McPearce's method of fact finding—that of using the facts as reported by the defendant's own expert—and her analysis were not unreliable.

¶59   Finally, as to fit, Rouse argues that Dr. McCormick-McPearce's testimony "did nothing to support the People." Fit requires the expert testimony to be logically and rationally linked to one or more material issues to be decided in the case and must assist the trier of fact to logically and rationally decide the case in light of common sense and everyday experience. Dr. McCormick-McPearce's testimony unquestionably enabled the jury to assess the expert testimony of Dr. Lu and determine whether it should be credited or not. In other words, the testimony "fit" the case, and the trial court did not abuse its discretion when it allowed Dr. McCormick-McPearce to testify.

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 37 of 45

2024 VI 4

## E. Mistrial

¶60 Because Rouse only disputes the mens rea elements of the crimes for which he was convicted and because there was ample record evidence from which a jury could have logically and rationally concluded that Rouse's actions were not a consequence of any asserted mental illness, certain challenged statements by the prosecutor had no effect on the outcome of the trial, and the convictions are affirmed.

¶61 As a starting point—and especially considering the grossly inappropriate nature of the comments involved in this matter—this Court emphasizes that

> Prosecutor[s] ha[ve] an obligation to seek justice, not merely a conviction, and must refrain from using improper methods to obtain a conviction. We emphasize that the responsibilities of a prosecutor go beyond the duty to convict defendants. Pursuant to its role of "minister of justice," the prosecution has a duty to see that defendants receive a fair trial.

*State v. Hughes*, 969 P.2d 1184, 1192 (Ariz. 1998) (citations and some internal quotation marks omitted). Acting in light of and with this command in the forefront of his consciousness, the prosecutor in a criminal case may argue the facts in evidence and any reasonable, logical inferences that follow therefrom. *Castor v. People*, 57 V.I. 482, 494 (V.I. 2012); *James v. People*, 59 V.I. 866, 888 (V.I. 2013).[25] A prosecutor's remarks are improper if they appeal to a jury's emotions, passions, or prejudices, thus diverting the focus of the trial from the evidence presented and leading the jury to convict for reasons other than those supported by the properly presented evidence. *DeSilvia v. People*, 55 V.I. 859, 872 (V.I. 2011); *Castor*, 57 V.I. at 495; *Brathwaite v. People*, 60 V.I. 419, 426 (V.I. 2014).

---

[25] Indeed, the purpose of closing summation and arguments is to allow the parties to mold the facts as brought out through the trial process in the light most favorable to their respective positions. *James*, 59 V.I. at 888.

¶62    In considering whether prosecutorial misconduct amounted to reversible error, we consider

whether the statement or conduct at issue was improper and whether the improper statement or

conduct made the trial so unfair as to render the trial a conviction without due process of law.

*Brathwaite*, 60 V.I. at 426.    Determining whether a prosecutor's statements or actions warrant

reversal because they made the trial so fundamentally unfair that the defendant was denied due

process requires that we consider the statements or conduct within the context of the entire trial,

giving consideration to the severity of the conduct or statements, the likely effect of any curative

instruction, other preliminary instructions and final charges to the jury, and the quantum of

evidence properly presented against the defendant.    *Monelle v. People*, 63 V.I. 757, 770 (V.I.

2015).[26]

¶63    As we have explained, when challenging the denial of a motion for mistrial, the defendant

bears the burden to show that: "(1) the prosecutor's conduct or remarks were improper, and (2) the

conduct or remarks affected the trial in a manner that made the trial unfair and affected the

defendant's substantial rights." *James*, 59 V.I. at 883; *Farrington*, 55 V.I. at 656.  Rouse identifies

six statements made by the People during trial that were improper, as follows:

> (1) Since May 10, 2012 the Defendant still had a plan.  He went out
> and retained one of the best, if not the best defense attorneys on
> the island.  (J.A. at 224-25)

> (2) Dr. Lu concluded the Defendant on May 10, 2012 suffered from
> something called a dissociative reaction.  The Defendant who
> has never really stated his side of the case.  (J.A. at 225-28)

> (3) Dr. Lu concluded he suffered from dissociative reaction and then
> a notice of insanity defense was filed.  Because insanity has been
> raised the burden shifts to the People to prove beyond a
> reasonable doubt.  (J.A. at 228, 229-30)

---

[26] *See Francis*, 56 V.I. at 389; *see also Francis v. People*, 59 V.I. 1075, 1080 (V.I. 2013); *James*, 59 V.I. at 883; *DeSilvia*, 55 V.I. at 873; *Castor*, 57 V.I. at 495.

(4) I further want to point out that it was Attorney King's Office that referred him to Dr. Lu, and there's a reason he was referred to Dr. Lu by Attorney King's office. (J.A. at 708)

(5) So he's referred by Attorney King's office because he would have no other defense to this case other than insanity. He had no option on this case. I also want to address the point about this allegation that Mrs. Rouse had told him that morning that he shot her that Shenovia was not his daughter . . . And I had brought that up with her months ago, I asked her . . . she denied it and that defendant never sought to have this paternity issue resolved. (J.A. at 708-09, 710)

(6) He's only charged with attempted murder. The only reason is that she didn't die. But even though he didn't kill her that day, he has ruined her life. He has ruined the life of his daughter. This will be with them forever. (J.A. at 710-11)

It is apparent that several of these statements were improper, some for multiple reasons. In making the second statement, the prosecutor implied that Rouse's exercise of his Fifth Amendment right against self-incrimination was a problem. In the fifth statement, the prosecutor was vouching for Vida. More specifically, the prosecution impermissibly vouched for a witness's credibility, as he suggested that there exist reasons, which have not been presented to the jury in court, that warrant believing the witness. *Mulley*, 51 V.I. at 414; *Francis*, 56 V.I. at 386; *see also United States v. Klemix*, 859 F.3d 436 (7th Cir. 2017).

¶64    We have held that vouching is the prosecution's assurance of the credibility of a witness based on either the prosecutor's personal knowledge of the testimony, or the witness's ability to testify truthfully, or some other information beyond the scope of the evidence presented to the jury. *Farrington v. People*, 55 V.I. 644, 656-57 (V.I. 2011); *Francis*, 56 V.I. at 388. Such assurances may be either explicit or implicit in the attorney's statements or conduct. *Francis*, 56 V.I. at 388. Prosecutorial vouching is improper because these comments give the impression that

other evidence has not been presented to the jury, that is known to the prosecution, that would support the charges, jeopardizing a defendant's right to be tried solely on the evidence properly presented to the jury, and such prosecutorial vouching carries with it the imprimatur of the Government, likely inducing the jury to trust the prosecutor's judgment rather than objectively evaluating the evidence among themselves, as required by law. *Id.* at 387 (quoting *Farrington*, 55 V.I. at 657).

¶65     Statements one, four, and five imply that being represented by counsel was somehow problematic and made the expert testimony less credible. Finally, statements one, two, four, five, and six all are designed to appeal to emotion. For example, the only reason for emphasizing retaining counsel is to imply that a guilty person is somehow "getting one over" on the justice system. This same implication is present in the statements regarding Rouse being referred to Dr. Lu by his attorney. The sixth statement is the most obvious appeal to emotions and nothing more, as the only reason to point out that the victim's lives are ruined is to appeal to the emotions of the jurors. The question remains whether the cumulative effect of the several statements so prejudiced the trial as to deny Rouse due process.

¶66     While the statements are exceedingly disconcerting, and the prosecution is admonished to refrain from such actions in the future,[27] Rouse was not denied due process. First, at each instance, Rouse objected to the statements, and the trial judge chided the prosecution and provided a curative instruction that the jury should wholly disregard any statement precluded by a sustained objection. It is well established that we presume that the jury understood and faithfully followed such instructions. *See, e.g., Saldana v. People*, 73 V.I. 649, 660 (V.I. 2020); *Monelle v. People*, 63 V.I.

---

[27] *Holland v. United States*, 348 U.S. 121, 136 (1954) (The Government's "duty is not to convict but to see that justice is done.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 41 of 45

2024 VI 4

757, 770 (V.I. 2015) (citing *Frett v. People*, 58 V.I. 492, 508 (V.I. 2013) and *Galloway v. People*, 57 V.I. 693, 711 (V.I. 2012)). Additionally, Rouse's counsel, during opening statements, admitted to all of the elements of the crimes charged. Therefore, the entire case hinged on whether the jury believed Rouse and Dr. Lu as to the facts surrounding the shooting and the opinions drawn therefrom. As discussed above, there was overwhelming evidence from which the jury could have concluded beyond a reasonable doubt that Rouse was either not suffering from a dissociative reaction when he shot Vida or that Rouse did not shoot Vida as a consequence of his asserted mental illness. In light of the immediate curative instructions given in each instance, the preliminary and final jury instructions defining what does and does not constitute evidence and directing the jury to disregard statements by attorneys because they are not evidence, as well as the presumption that the jurors understood and followed these instructions, and the overwhelming nature of the evidence of Rouse's sanity, we conclude that the cumulative effect of these purported errors did not affect the outcome of the trial and, therefore, did not deprive Rouse of due process, and the convictions are affirmed.[28]

### F. Jury Instructions

¶67    Because it is constitutional to place upon a defendant the obligation of rebutting the presumption of sanity by requiring there be some evidence in the record that the actions charged were taken as a consequence of the defendant's mental illness before the prosecution is required to affirmatively prove a defendant's sanity, *Nibbs*, 52 V.I. at 284, the challenged jury instruction

---

[28] If any doubt remained in this court's collective mind as to whether the cumulative effect of all the asserted misconduct affected the outcome of the trial, a reading of *Hughes*, 969 P.2d 1184, removes any doubt. A comparison of the repeated and egregious statements by the prosecutor in that case demonstrates that any prejudice from the statements complained of here was tempered and cured by the remedial actions of the trial court and the overall handling of the trial and instructions to the jury.

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 42 of 45

2024 VI 4

on these issues was not in error and was certainly not an abuse of discretion. Rouse challenges the

jury instruction, which stated that

> Once the defendant introduces some evidence of mental illness, the
> defendant can be[29] at the time of the offense becomes an element
> of the crime, which like all other elements of the crime must be
> proven by the People beyond a reasonable doubt.

(J.A. at 747.) Rouse argues that this instruction, though articulating the standard set forth by this

Court in *Petric*, 61 V.I. at 410, violated his due process rights under Clause 23 of Section 3 of the

Revised Organic Act making the Due Process Clauses of the United States Constitution applicable

to the Virgin Islands[30] by placing a burden of proof upon the defendant and relieving the People

of their burden of proving to the jury every element of the crime beyond a reasonable doubt. There

is no basis for this claim.

> Due process of law is a summarized constitutional guarantee of
> respect for those personal immunities which, as Mr. Justice Cardozo
> twice wrote for the Court, are 'so rooted in the traditions and
> conscience of our people as to be ranked as fundamental,' *Snyder v.
> Massachusetts*, 291 U.S. 97, 105 (1934), or are 'implicit in the
> concept of ordered liberty.' *Palko v. Connecticut*, 302 U.S. 319, 325
> (1937).

---

[29] This is as written in the trial transcript. It appears that this is errata and a mis-transcription by the reporter of the words "defendant's insanity" rather than "defendant can be." Because Rouse has not argued that these words prejudiced him—instead arguing that the language stating "once the defendant introduces some evidence" is an unconstitutional shifting of the burden of proof in violation of Rouse's Fifth, Sixth, and Fourteenth amendment rights, as codified in section 3 of the Revised Organic Act of 1954" (App. Br. At 22), Rouse has waived any claim of error in this regard. V.I.R. App. P. 24(m).

[30] This opinion does not address whether the Due Process guaranty in Clause 1 of Section 3 of the ROA provides greater protection than the federal due process guaranty. *See generally Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048 (V.I. 2019) (holding that clauses 1-22 of section 3 of the ROA constitute a Territorial Bill of Rights equivalent to such provisions in a state constitution). Indeed, given the origins of Virgin Islands law in both the codes of laws of what were then the territories of Oregon and Alaska and in the various Danish Colonial Laws, there are arguments to be made that proof of sanity must be affirmatively produced in the prosecution's case in chief so long as there is some evidence warranting an insanity instruction. *See generally Greer v. People*, 74 V.I. 556, 580 n.24 (V.I. 2021) (noting that many of the provisions of the Virgin Islands Code were based on the codes of laws of Oregon and Alaska).

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 43 of 45

2024 VI 4

*Rochin v. California*, 342 U.S. 165, 168 (1952). Therefore, due process provides boundaries beyond which legislatures may not go in placing limits on evidence and allocating burdens of proof. *See Daniels v. Williams*, 474 U.S. 327, 331 (1986). Insanity rules, like the one established by the Legislature in subsection 14(4) of title 14, "are attempts to define, or at least to indicate, the kinds of mental differences that overcome the presumption of sanity or capacity and therefore excuse a defendant from customary criminal responsibility . . . ." *Clark*, 548 U.S. at 768 (citations omitted).

¶68 As the Supreme Court of the United States has concluded, a jurisdiction "may provide, for example, that whenever the defendant raises a claim of insanity by some quantum of credible evidence, the presumption disappears and the government must prove sanity [beyond a reasonable doubt]." *Clark*, 548 U.S. at 769. Such a presumption does not shift the burden of proof to the defendant as to the ultimate burden of persuasion regarding the sanity or insanity of a defendant— the burden of proof beyond a reasonable doubt of a defendant's sanity always and forever remains on the prosecution. *Petric*, 61 V.I. at 410 ("[T]o raise the insanity defense a defendant need only introduce 'some evidence' tending to show that he was 'mentally ill and . . . committed the act charged against [him] in consequence of such mental illness.' Once the defendant introduces 'some evidence' of mental illness, the defendant's sanity at the time of the offense become an element of the crime, which, like all other elements of the crime, must be proven by the People beyond a reasonable doubt." (citing *Nibbs*, 52 V.I. at 284; *Davis*, 160 U.S. at 488; *Wright v. United States*, 250 F.2d 4, 7 (D.C. Cir. 1957)).[31] The jury instruction challenged by Rouse accurately

---

[31] *See also Davis*, 160 U.S. at 487 ("Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime."); *cf. Clark*, 548 U.S. at 771 ("No one, certainly not [the defendant] here, denies that

stated the law as articulated by this Court in its interpretation and application of section 14 of title

14 of the Virgin Islands Code and as articulated in constitutional terms by the United States

Supreme Court. Where a jury instruction correctly states the law, there is no error.[32]

## III. CONCLUSION

¶69     Because section 14 of title 14 of the Virgin Islands Code is a codification of the common

law presumption of sanity, there was no error when the trial court held that the mere filing of a

notice of intent to assert an insanity defense, in compliance with the rules of criminal procedure,

does not rebut the presumption of sanity. Additionally, because the evidence in the prosecution's

case-in-chief, in light of common sense and everyday experience, logically and rationally allowed

for the conclusion that Rouse's actions were not a result of mental illness, there was no error when

the motion for judgment of acquittal was denied at the close of the prosecution's case-in-chief.

Further, Dr. McCormick-McPearce was qualified to offer expert testimony in this matter and

offered an opinion validly criticizing and undermining the opinion of Rouse's expert. This was a

---

a State may place a burden of persuasion on a defendant claiming insanity." (citing *Leland*, 343 U.S. at 798)); *see generally Powell v. Texas*, 392 U.S. 514, 536 (1968) (plurality opinion) ("The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing . . . moral, philosophical, and medical views of the nature of man."); *Mullaney v. Wilbur*, 421 U.S. 684, 694-96 (1975) (discussing the historic common law evolution of mens rea in homicide prosecutions); *Speiser v. Randall*, 357 U.S. 513, 525-26 (1958) ("[W]here one party has at stake an interest of transcending value—as a criminal defendant his liberty—th[e] margin of error is reduced as to him by the process of placing on the [prosecution] the burden . . . of persuading the fact finder at the conclusion of the trial . . . ."); *e.g., Clark*, 548 U.S. at 765 (holding as constitutional a rule limiting the consideration of mental disease and capacity evidence only in relation to the affirmative defense of insanity, but not allowing its consideration as to mental intent/mens rea).

[32] *See Leland*, 343 U.S. at 800 ("It is contended that the instructions may have confused the jury as to the distinction between the State's burden of proving premeditation and the other elements of the charge and appellant's burden of proving insanity. We think the charge to the jury was as clear as instructions to juries ordinarily are or reasonably can be, and, with respect to the State's burden of proof upon all the elements of the crime, the charge was particularly emphatic. Juries have for centuries made the basic decisions between guilt and innocence and between criminal responsibility and legal insanity upon the basis of the facts, as revealed by all the evidence, and the law, as explained by instructions detailing the legal distinctions, the place and weight of the burden of proof, the effect of presumptions, the meaning of intent, etc. We think that to condemn the operation of this system here would be to abandon the system generally. We are not prepared to do so.").

*Rouse v. People*
S. Ct. Crim. No. 2017-0051
Opinion of the Court
Page 45 of 45

2024 VI 4

valid method of discrediting the defense's evidence of insanity and creating an issue of fact for the jury to decide. The admission of the testimony of Dr. McCormick-McPearce was not an abuse of discretion.

¶70 Furthermore, while the prosecution made inappropriate statements, the evidence in this matter was corroborated by multiple witnesses and items of evidence and was simply overwhelming. We conclude beyond a reasonable doubt that these statements, though improper, did not affect the outcome of the trial. Therefore, the denial of the defense motion for mistrial was not an abuse of discretion. Finally, the jury instruction stating "Once the defendant introduces some evidence of mental illness" accurately stated the law in the Virgin Islands and the trial court's refusal to give the instructions requested by Rouse was not an error, much less an abuse of discretion. Accordingly, the October 6, 2017 judgment and commitment of the Superior Court is affirmed.

**Dated this 17th day of January, 2024.**

**BY THE COURT:**

**IVE ARLINGTON SWAN**
**Associate Justice**

**ATTEST:**
**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

By: _____
    **Deputy Clerk II**
Dated: January 17, 2024